In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3395

WILLIAM PADULA, Administrator of
the Estate of Jerome Clement,

*Plaintiff-Appellant,*

*v.*

TIMOTHY LEIMBACH, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:07-cv-00035—**Joseph S. Van Bokkelen**, *Judge.*

ARGUED MAY 4, 2011—DECIDED AUGUST 29, 2011

Before EASTERBROOK, *Chief Judge*, and FLAUM and
SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. Jerome Clement, a diabetic, was
suffering from a hypoglycemic episode while driving when
he veered off the road and into a parking lot. Officers
called to the scene had reason to believe he was intoxi-
cated. When he did not comply with their commands to
step out of his car, they physically removed him, maced

him two or three times, struck him four times with a baton to place handcuffs on him and prevent him from kicking his legs and flailing his arms, and kept him in the prone position until a paramedic arrived. The paramedic recognized Clement's condition and eventually got him to a hospital, where he died of natural causes roughly two weeks later. William Padula, the Administrator of Clement's estate, filed § 1983 claims against the responding officers, the City of East Chicago ("the City"), the City of East Chicago Police Department ("the Police Department"), and Chief Angelo Machuca Jr. ("Chief Machuca") for wrongful arrest, excessive force, failure to train the officers, and condoning the use of excessive force, in addition to claims under state law. The district court granted the defendants' motion for summary judgment on Padula's federal claims and remanded his state law claims to state court. We affirm.

## I. Background

Clement was an insulin-dependent Type 1 diabetic. His blood sugar periodically dropped, which could cause him to phase out, fall to the floor, and flail his arms in a non-combative manner.

On August 24, 2006, while driving to work, Clement turned his vehicle into the parking lot at Metal Management and stopped on or near a truck scale. An employee approached and asked him to move, but he appeared not to hear what the employee said and responded in incomprehensible gibberish. Someone called 911 to report the incident and explained that an

unresponsive person in a car was blocking the company's scale, but that she did not know whether the person was intoxicated. Before police arrived, Clement's car began moving towards a building, prompting someone at the scene to reach into the car, put it in park, and remove the keys. At around this time, a bystander observed Clement frustrated and talking to himself in an argumentative tone. He eventually passed out at the wheel.

Officers Jesus Arceo and Timothy Leimbach, responding to a dispatch shortly after 10 AM indicating that there was an intoxicated man in a car, were the first police officers at the scene. They initially observed Clement slouched over and tried to wake him by shaking him and asking if everything was all right. When they asked him to get out of the car, he spoke in an angry tone and did not comply. Officer Leimbach observed Clement's eyes roll back into his head as he remained unresponsive. Officer Arceo recalled that Clement was unkempt, his eyes were bloodshot, and his car smelled like stale beer. Officer Leimbach also smelled alcohol in the car. But neither observed any open alcohol in the car. Officer Nathaniel London, a canine handler, arrived at the scene at some point after Officers Arceo and Leimbach, also in response to a dispatch for an intoxicated person.

Clement eventually woke up and, upon seeing Officer Arceo, swung his arm in Officer Arceo's direction but made no contact. He did not cooperate with the officers' repeated requests to step out his car. So Officer Leimbach, leaning into the car from the front passenger side, unbuckled Clement and the officers tried to physi-

cally remove him from the car. Record evidence indicates that Clement was dead weight. When the officers pulled him out of the car, he fell to the ground, his legs partially under the car, and did not comply with the officers' demands to move away from the car. The officers then physically moved Clement out from under the car.

Next, while lying on his stomach, he ignored their commands to put his hands behind his back and physically resisted their attempts to handcuff him. A bystander observed Clement's eyes roll back in his head and that he was foaming at the mouth. Clement continued to kick, flail his arms, and move his head up and down, which caused him to hit his face against the pavement, resulting in scratches and some bleeding. An observer did not think Clement knew what was going on or was consciously fighting the officers, but rather that he was flailing around "like he was having . . . a seizure of some sort maybe." A police dog was released from the police car at some point, but it is unclear whether an officer ordered the dog to bite Clement; regardless, the dog did not attack Clement in any way.

The officers managed to cuff one of Clement's hands, but he did not obey commands to put his other arm behind his back. An officer then struck Clement's free arm with a baton while trying to place it in handcuffs. For what appears to be a fairly short period of time, one officer had his knee on Clement's head while the other officers held him in the prone position: Officer Arceo held the top of Clement's body, Officer Leimbach kept

Clement's shoulders down, and Officer London held his torso. The officers eventually secured the second handcuff, all the while struggling to keep Clement down as he tried to stand up. During the struggle, Officer Leimbach struck Clement's leg with a baton three times because he was kicking Officer Leimbach and screaming. An observer described the baton strikes to Clement's arm and leg as "stern," but not "severe." Officer Leimbach eventually pinned Clement's leg against his buttocks. Officer Arceo, who did not smell alcohol on Clement's breath when near Clement's head, called for an ambulance at some point during the struggle when he saw blood on Clement's face.

The officers sprayed mace into Clement's face at least once and possibly twice in the process of moving him from his car to the ground and into handcuffs; the record is inconclusive. There is record evidence that someone maced Clement while he was still in the car, and also that Officer Leimbach maced him after he was re- moved from the car because he was resisting and swinging his arms close to Officer Leimbach, who testified that he believed Clement was trying to hit him. Officer Leimbach stopped macing Clement because it was having no effect; he continued resisting with his eyes closed.

At some point, Officer Harretos arrived and took over for Officer London, who returned the dog to the car. While helping to hold Clement down as he continued screaming and attempting to stand up, Officer Harretos sprayed mace in Clement's face—which was either the

second or third time Clement was maced—but stopped when the two officers told him that their previous attempts to mace Clement had no effect. He testified that he had not seen the other officers mace Clement, and that he did not smell alcohol on Clement.

Clement's face was bleeding from hitting his head against the pavement and began turning blue while the officers held him down. Fortunately, paramedic Frank Torres was called to the scene by a dispatcher who indicated that Clement was possibly intoxicated. Torres arrived at about 10:22 AM, roughly twenty minutes after the officers were dispatched to the scene, and observed Clement in a semi-prone position, laying on his right shoulder, and "thrashing about." Torres took Clement's vitals, checked his blood sugar, which was low, and then administered a Dextrose injection at 10:27 AM and a second a minute later, after which Clement stopped breathing. Torres instructed the officers to remove the handcuffs so Clement could be placed in the ambulance. He regained a strong pulse on his way to the hospital. Torres did not smell alcohol on Clement's breath at any point.

At the hospital, Officer Leimbach received Clement's wallet, which had been in one of his pant pockets during the relevant events and contained a diabetic card. The emergency room doctor intubated Clement and later diagnosed him with acute cardiac and respiratory failure, severe hypoglycemia, and severe metabolic and respiratory acidosis. At the hospital, testing revealed that Clement had marijuana and a low presence of alcohol in his system.

When Clement's grandmother, Phyllis Jordon, retrieved Clement's vehicle, which had been towed from the scene, she found Frusion bottles on the front passenger seat and his diabetic kit pushed into the passenger seat but still visible. The record indicates that Clement was not wearing a diabetic necklace or bracelet during the relevant events. Clement died of natural causes on September 8, 2006, roughly two weeks after the relevant events.

His estate filed suit against the defendants in Indiana state court, and the defendants removed to federal court. Counts I and II assert state law causes of action for wrongful death, negligence, and intentional conduct, and for negligent training, hiring, and supervision, respectively. Count III is a § 1983 claim contending that the Officers used excessive force and wrongfully arrested Clement, in violation of the United States Constitution, in addition to an analogous state law claim. Counts IV and V, also claims under both state law and § 1983, allege that the City, the Police Department, and Chief Machuca failed to train and supervise the Officers, and that they condoned and ratified excessive force. The district court granted the defendants' motion for summary judgment on Padula's federal claims and remanded his state law claims to state court.

## II. Discussion

Padula appeals the district court's decision to grant the defendants' motion for summary judgment. Summary judgment shall be granted "if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. We review de novo the district court's decision to grant summary judgment and construe all facts and inferences in the light most favorable to Padula, the nonmoving party. *Thomas v. H&R Block E. Enters., Inc.*, 630 F.3d 659, 663 (7th Cir. 2011). After briefly discussing § 1983, we explain our decision to affirm the district court's decision to grant summary judgment to the defendants on Padula's federal claims. Notably, the district court found no Fourth Amendment violation, so it declined to decide whether qualified immunity applied. That issue is not raised on appeal.

"Title 42 U.S.C. § 1983 creates a federal cause of action for 'the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States.'" *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997) (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994)). It does not create substantive rights; rather, "it is a means for vindicating federal rights conferred elsewhere." *Id.* "A cause of action under § 1983 requires a showing that the plaintiff was deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). In § 1983 cases, "the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010); *see also Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986) ("[Federal Rule of Civil Procedure 56] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 627-28 (7th Cir. 2006).

### A. Wrongful Arrest

Padula appeals the district court's decision to grant the defendants' motion for summary judgment on his claim against the Officers for wrongful arrest. He contends that the district court erred when it found they had probable cause. We disagree.

Probable cause is an absolute defense to a wrongful arrest claim asserted under § 1983 against police officers. *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008).

> A police officer has probable cause to arrest if, at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. In determining whether an officer had probable cause, the court steps into the shoes of a reasonable person in the position of the officer. The probable cause determination must be made by a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.

*Id.* at 686 (internal quotation marks and citations omitted); *see also Marshall ex rel. Gossens v. Teske*, 284 F.3d 765, 770 (7th Cir. 2002); *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994). "Critically, the probable cause analysis is an *ex ante* test: 'the fact that the officer later discovers additional evidence unknown to her at the time of the arrest is irrelevant as to whether probable cause existed at the crucial time.'" *Smith v. Ball State Univ.*, 295 F.3d 763, 769-70 (7th Cir. 2002) (quoting *Qian v. Kautz*, 168 F.3d 949, 953-54 (7th Cir. 1999)).

The district court correctly concluded that the Officers had probable cause to arrest Clement. Specifically, when the arrest occurred, which was when the officers removed Clement from his car and began attempting to handcuff him, *see Smith*, 295 F.3d at 769-70, the Officers had probable cause to believe that Clement had driven while intoxicated, a crime in Indiana. IND. CODE § 9-30-5-2 (2011).

Ample record evidence supports our conclusion. For example, the dispatcher who called the Officers to the scene indicated that the driver, who had driven off the road, was intoxicated; the Officers observed that Clement did, in fact, appear to have driven off the road; Officers Arceo and Leimbach smelled alcohol in Clement's car; Clement was slouched over in his car, appeared unkempt, and had bloodshot eyes when Officers Arceo and Leimbach arrived; and Clement did not comply with their requests to step out of his vehicle. Padula does not contend that these characteristics are inconsistent with how an intoxicated individual

would act. In addition, Clement was not wearing a diabetic necklace or bracelet that would have alerted the Officers to his medical condition, nor is there any indication that his wallet—containing his diabetic card—was accessible to the Officers during the struggle.

Padula failed to produce sufficient evidence to create a genuine issue of material fact. Clement's grand-mother testified that after Clement's car was towed from the scene, she found his diabetic kit pushed down in the front passenger seat but still visible. And there is record evidence that Officer Leimbach was in or near that seat when he unbuckled Clement. But there are critical gaps in the record: There is no evidence that any of the Officers saw or should have seen the kit, and there is also no indication of the kit's labeling at the time of arrest. Thus, even inferring that the kit was visible on Clement's front seat, Padula failed to present any evidence that the Officers could have identified it as a diabetic kit in the heat of the moment. Further, Padula does not reference any evidence that the Officers saw or should have seen Clement foaming at the mouth while he was on the ground, which could have alerted them to Clement's medical condition.

Next, Padula points to one observer's vague testimony that, while on the ground, Clement was flailing his arms and legs "like he was having—I don't know, like a seizure of some sort maybe." Without more clear record evidence, however, we have no basis to find that a jury could infer that the Officers unreasonably believed that Clement was intoxicated.

Finally, Padula contends that the fact that Officer Arceo called for an ambulance evidences that he suspected a medical issue. Officer Arceo testified, however, that he called the ambulance when he saw blood on Clement's face; he made no mention of a potential medical condition as a reason for calling the ambulance. Officer Leimbach also testified that the ambulance was called because Clement had blood on his face.

Because Padula failed to meet his burden at summary judgment, the district court correctly granted summary judgment for the defendants on Padula's wrongful arrest claim.

## B. Excessive Force

Padula also appeals the decision to dismiss his excessive force claim against the Officers. Again, we affirm.

We evaluate Padula's excessive force claim under the Fourth Amendment's reasonableness standard. *See McAllister*, 615 F.3d at 881. "The dispositive question is whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner." *Id.*; *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). In answering that question, a number of factors are relevant:

> [W]e consider factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." We also consider whether

the citizen was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties. In the end, the excessive force inquiry looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers— if left unattended.

*Jacobs v. City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000) (quoting *Graham*, 490 U.S. at 396; other internal quotation marks and citations omitted); *see also Chelios*, 520 F.3d at 689. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers[,] violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97 (internal quotation marks and citations omitted).

The district court correctly concluded that the Officers' use of force was not excessive. In light of the circumstances and their reasonable belief that Clement was intoxicated, Officers Leimbach and Arceo were entitled to forcibly remove him from his car when he did not comply with their command to get out on his own. *See Smith*, 295 F.3d at 769 ("Smith posed a threat to himself, the officers and the general public, even after Officer Foster turned off Smith's vehicle and attempted unsuccessfully to communicate with him. Indeed, . . .

his unresponsiveness did not neutralize the safety threat, but rather exacerbated it by adding an element of unpredictability. We thus find that the decision to remove Smith from his vehicle was a constitutionally permissible action pursuant to a legitimate investigatory stop under *Terry*."); *id.* at 770. Further, we find no evidence that the Officers removed Clement from his car by throwing him to the ground, as in *McAllister*, to which Padula directs our attention, but rather that he fell to the ground as dead weight as they pulled him out. *See McAllister*, 615 F.3d at 884 ("Viewed in the light most favorable to McAllister, the evidence shows that Price ignored obvious signs of McAllister's medical condition, pulled him out of the car, and took him to the ground with such force that McAllister's hip was broken and his lung bruised from the force of Price's knee in his back, not because such force was necessary but because Price was 'angry' with McAllister. Even if Price was justified in using some force to remove McAllister from the vehicle, using the force involved here against a non-resisting suspect could have been unreasonable given the circumstances."). It was also reasonable to use mace to attempt to control Clement under the circumstances, which involved a physical struggle both before and after placing him in handcuffs. *See Brooks v. City of Aurora, Ill.*, No. 10-3265, slip op. at 16, 2011 WL 2623507, at *6 (7th Cir. July 6, 2011) ("Courts often have held that it is reasonable to use pepper spray against a suspect who is physically resisting arrest . . . ."); *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("Courts have consistently concluded that using pepper

spray is reasonable . . . where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital. Furthermore, as a means of imposing force, pepper spray is generally of limited intrusiveness, and it is designed to disable a suspect without causing permanent physical injury. Indeed, pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee. " (internal quotation marks and citations omitted)). The Officers' use of batons was also reasonable. Record evidence indicates that Officer Leimbach's baton strikes were "stern," but not "severe," which was appropriate in response to Clement kicking and flailing his arms. Further, Officer Leimbach struck Clement's leg a third time only because his first two strikes did not allow him to pin Clement's leg to his buttocks and prevent him from kicking; there is no indication that Officer Leimbach used his baton gratuitously. And while Padula points to Clement's death, presumably as evidence of the Officers' force, *see McAllister*, 615 F.3d at 881 ("[A] jury may look to the type of injury suffered by a plaintiff to determine whether or not the amount of force used by law enforcement was reasonable."), the Coroner's Verdict states that Clement died of natural causes, not because of any force used two weeks before his death, and we find no other indication in the record that Clement's death was related to the Officers' force, *see id.* at 882 ("If McAllister had no evidence that his injuries were caused by Price, they would be irrelevant . . . ."). Finally, holding Clement in the prone position for a fairly short period of time while trying to prevent him from injuring

himself or an officer was not unreasonable. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (finding force not excessive where the plaintiff "was placed in a prone position with his hands and legs restrained because of the need to incapacitate him and to protect the safety of the officers and other witnesses from the dangers posed by his violent behavior," and explaining that "[r]estraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest"); *Cf. Smith*, 295 F.3d at 771 (finding no excessive force where the police kept the plaintiff in handcuffs several minutes after learning that he was diabetic because "the use of force was measured, brief and appropriate to accomplish the purposes of the investigatory stop—securing Smith and his vehicle, dispelling any notion that Smith was engaged in criminal activity and preserving the officers', public's and even Smith's safety"). The Officers faced a fluid situation; as the struggle with Clement escalated, the Officers appropriately increased their force in order to keep the situation under control. *See Smith*, 295 F.3d at 770 ("When police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them."); *Estate of Phillips*, 123 F.3d at 593.

Padula nonetheless argues that the Officers used unreasonable force. He points to the fact that an officer had his knee on Clement's head at some point during the scuffle. But that was a reasonable way to prevent Clement from continuing to hit his head against the

pavement, and there is no indication that the officer applied excessive pressure with his knee or that his knee injured Clement in any way. He also notes that a bystander observed Clement foaming at the mouth while on the ground, which could have suggested a medical condition. But, as explained above, Padula does not reference anything in the record indicating that the Officers saw or should have seen this.

Padula further contends that *McAllister v. Price*, 615 F.3d 877 (7th Cir. 1997), and *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010), in which we concluded that defendant-officers were not entitled to summary judgment, warrant reversing. The facts of those cases, however, distinguish them from Padula's. In *McAllister*, for example, the plaintiff, who crashed his car during a hypoglycemic episode, was unable to respond to the officer's questioning. 615 F.3d at 879. In response to "a non-resisting suspect," the officer "'threw' McAllister to the ground by applying his knee to McAllister's lower back, with his full body weight behind it." *Id.* at 879, 885. We concluded that McAllister had introduced sufficient evidence for a jury to infer that the officer's force caused Price's injuries, which included a broken hip, bruised lung, and other bruises, scrapes, and cuts that left him in the hospital for three weeks and required several weeks of rehabilitation. *Id.* at 884*; see also Cyrus*, 624 F.3d at 858, 862 (plaintiff was tasered between six and twelve times and was pronounced dead upon arrival at the hospital later that day). Excessive force claims require a fact-based, case-by-case inquiry, and, as explained above, in this case, unlike *McAllister* and *Cyrus*,

there is no genuine issue as to any material fact. *See Estate of Phillips*, 123 F.3d at 592.

In light of our hesitation "to second-guess the snap judgments made by law enforcement personnel," *McAllister*, 615 F.3d at 883, and because the record does not present any genuine issue of material fact indicating that the Officers used excessive force, we affirm the district court's decision to grant summary judgment to the defendants on Padula's excessive force claim.

### C. Padula's Remaining Claims

Padula also filed claims against the City, the Police Department, and Chief Machuca for failing to adequately train and supervise the Officers, and for condoning and ratifying excessive force, both of which, he contends, resulted in the constitutional violations he alleges occurred. That Clement makes no legal arguments regarding either claim until his reply brief permits us to find the issues waived. *See United States v. Diaz*, 533 F.3d 574, 577 (7th Cir. 2008) (arguments raised for the first time in a reply brief are waived).

Even if not waived, however, the arguments cannot succeed. Since Padula's underlying claims for wrongful arrest and excessive force failed, his claims for failure to train and for condoning and ratifying excessive force must also fail. *See Carlson v. Bukovic*, 621 F.3d 610, 623 (7th Cir. 2010); *Estate of Phillips*, 123 F.3d at 596-97. We thus affirm the district court's decision to grant summary

judgment for the defendants on Padula's remaining federal claims.

### III. Conclusion

While respectfully recognizing the tragic circumstances surrounding Jerome Clement's death, we are compelled to AFFIRM the judgment of the district court granting summary judgment to the defendants on Padula's federal claims. Accordingly, we also AFFIRM its decision to remand Padula's remaining state law claims to state court.