TINDER, Circuit Judge,
dissenting.
I have no major quarrel with the majority’s description of the facts and the applicable legal standards. I respectfully dissent, though, because I cannot agree that based on those facts, a reasonable jury had to find in favor of Phillips. Excessive force claims generally require a fact-based, case-by-case inquiry, and as such, we have often held that the question of whether force is excessive must be decided by a jury. See, e.g., Cyrus v. Town of Mukwonago, 624 F.3d 856, 862 (7th Cir.2010); McAllister v. Price, 615 F.3d 877, 884 (7th Cir.2010); Abdullahi v. City of Madison, 423 F.3d 763, 773 (7th Cir.2005). “[W]e have recognized that summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer’s use of force is often susceptible of different interpretations.” Cyrus, 624 F.3d at 862. I am aware of no case before this one, however, where we have reversed a jury verdict in favor of a defendant officer by concluding that the officer’s use of force under the totality of circumstances was excessive as a matter of law. The facts in this case should not lead us to such an extraordinary result.
Although most of the relevant facts in this case are undisputed, it is within the jury’s province to determine what reasonable inferences to draw from those facts. See Abdullahi, 423 F.3d at 770 (stating that it is for the jury, not us, to weigh all the evidence and choose between competing inferences). I agree with the majority that the “[ojbjective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide,” Maj. Op., p. 520, but the facts of this case and the reasonable inferences arising from them (as discussed below) properly permitted the jurors to assess the reasonableness of the defendants’ actions.[1] It is my position in dissent that, when viewed in the light most favorable to the defendants, reasonable inferences drawn from the record support the jury’s determination. Admittedly, this is a difficult and close case. Nevertheless, given the situation faced by the officers, I believe that whether four shots was too many under the circumstances was a question properly presented to the jurors.
“The dispositive question is whether, in light of the facts and circumstances that confronted the officers] (and not 20/20 hindsight), the officers] behaved in an objectively reasonable manner.” Padula v. *531 Leimbach, 656 F.3d 595, 602 (7th Cir.2011) (quoting McAllister, 615 F.3d at 881). As the majority observes, relevant factors to consider include the severity of the crime, the immediate threat the suspect poses to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. See Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). “The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.” Id.
The jury was presented with sufficient facts to support a finding that the officers behaved in an objectively reasonable manner. The crimes under investigation were not trivial. Lieutenant Russell Jack and Officer James Hoffman reasonably believed that the woman in control of the vehicle (who they discovered after the arrest was Tamara Phillips) might act dangerously and unpredietably based on the dispatch reports and their observations of her bizarre behavior inside the vehicle. Indeed, Phillips’s erratic driving (one caller described the vehicle as “all over the road”) endangered other drivers and ended with the vehicle stopped on a sidewalk and facing the street in a residential area. When officers repeatedly ordered Phillips to show her hands and exit the vehicle, instead of complying, she lit a cigarette, placed a water bottle outside the driver’s door, and at one point placed both feet out of the driver-side window, leaning back toward the center console. The events of that evening were full of uncertainty. The lighting of the cigarette is just one example of the ambiguity confronting the officers. Was this the action of a highly intoxicated individual or “one last smoke” by a person intending to undertake a violent confrontation with the police? We know now that it was, fortunately, the former and not the latter, but how could the police on the scene know that at the time of the incident?
There was also confusion over whether the vehicle was stolen. Even though the officers had information suggesting the vehicle may not have been stolen, the facts were sufficient for the jury to find that the officers acted reasonably in approaching the situation as a “high risk traffic stop” involving a potentially stolen vehicle. I agree with the majority that there was “sufficient information to call into question whether Phillips’s vehicle was stolen,” Maj. Op., p. 524, but the officers on the scene did not have the luxury of investigating why the license plate number of a car reported stolen was transferred to a different vehicle. Lieutenant Jack testified that the Department of Transportation had a general policy prohibiting reassignment of plates from stolen cars to other vehicles. Under these circumstances, the jurors could find it reasonable for the officers, out of caution, to proceed as though the vehicle was stolen.
The officers had reason to believe that Phillips posed a threat to the safety of the officers and others. The car was in a residential area where people could be traveling and was pointed toward the street in the direction of the officers. The officers testified that they believed the car was still running because its headlights were on. Based on these facts, a reasonable jury could find that the officers faced a threat that Phillips would attempt to drive the car toward them, especially considering her subsequently confirmed intoxicated state and bizarre behavior.
The majority concludes that there was no immediate threat because “[t]he officers *532 had [Phillips’s] vehicle surrounded with seven squad cars, and behind the vehicle there was a steep drop-off.” Maj. Op., p. 525. I have a slight disagreement with this understanding of the scene; I don’t think the most favorable construction of the record shows that all seven squad cars were surrounding Phillips’s vehicle; some were blocking traffic on adjacent streets. (Tr. p. 88). But that is not a major point, and I agree it was not likely that Phillips could have escaped because it would have been extremely difficult for her to plow through the phalanx of policemen and police vehicles, to say nothing about her chances of eluding them in a chase. But that doesn’t mean she wasn’t in a position to harm the officers by driving her car forward. Although Phillips’s feet were outside the car, within seconds she could have hit the gas. Again, the officers could have reasonably believed that Phillips was substantially under the influence of alcohol or drugs, and as a result, mentally unstable and unpredictable. The officers also did not know whether Phillips was armed, making her strange and unpredictable behavior even more alarming. These circumstances, combined with the confusion over the stolen vehicle report with respect to the license plates on the vehicle, required the officers to proceed with extreme caution. As such, they could reasonably believe that Phillips posed a threat to them safety and to anyone else who might be in the vicinity.
Because this was a high-risk traffic stop, police procedure was to order the “suspect to shut the car off, put the keys outside the car, and then step out of the car, and then walk back to [a] safe location” for the officers to take the suspect into custody. (Tr. p. 193). Despite the officers’ clear, loud, and repeated orders to step out of the vehicle, Phillips failed to comply. Her unresponsiveness to Lieutenant Jack’s commands to step out of the car “did not neutralize the safety threat, but rather exacerbated it by adding an element of unpredictability.” See Smith v. Ball State Univ., 295 F.3d 763, 769 (7th Cir.2002) (“Smith posed a threat to himself, the officers and the general public, even after Officer Foster turned off Smith’s vehicle and attempted unsuccessfully to communicate with him. Indeed, ... his unresponsiveness did not neutralize the safety threat, but rather exacerbated it by adding an element of unpredictability.”). Phillips continued moving around in the vehicle and had even reached toward the glove box, which Officer Hoffman testified would be consistent with “someone ... obtaining a weapon.” (Tr. p. 196). Although Lieutenant Jack radioed dispatch and said, “We have the person secured here, not in handcuffs, but stabilized in the car,” he testified that meant the suspect was in the car, the car wasn’t moving, and the driver was not currently fleeing. (Tr. p. 286). Lieutenant Jack never indicated that the driver no longer posed a threat to their safety.
I agree that Phillips wasn’t actively resisting arrest in the sense of physical resistance; she wasn’t aggressive or confrontational at any point. She nevertheless failed to obey the officers’ repeated, simple commands to step out of the vehicle. Based on the evidence presented to the jurors, they could have reasonably found that Phillips’s noncompliance was purposeful, conscious resistance to submission of their authority. The officers had reason to believe Phillips was conscious (based on her lighting of the cigarette and other movements) and there was nothing indicating that she was suffering from a medically induced condition aside from intoxication. Compare Padula, 656 F.3d at 602 (force used against driver suffering from a hypoglycemic episode was not excessive where there was no facts alerting the offi *533 cers of his medical state), with McAllister, 615 F.3d at 884 (“[T]he evidence shows that Price ignored obvious signs of McAllister’s medical condition, pulled him out of the car, and took him to the ground with such force that McAllister’s hip was broken and his lung bruised from the force of Price’s knee in his back....”). The officers wanted Phillips to step out of the car because they were uncertain what Phillips might do if they approached, whether she had any weapons within reach, or whether there was anyone else in the vehicle. The goal in a high-risk stop is to distance the suspect from the vehicle as much as possible so that officers can control the environment in which the person is taken into custody. (Tr. p. 215). Under these facts, and looking at the situation as it was unfolding at the time, a jury could have determined that it was reasonable for the officers to use the SL6 baton launcher to gain compliance with their orders.
Of course, this case certainly gets more difficult when determining the reasonableness of multiple shots. The officers couldn’t simply keep shooting the baton launcher until they gained compliance; at some point the amount of force becomes excessive. As the majority properly suggests, repeated applications of force are “reasonable only when exercised in proportion to the threat posed,” and “ ‘striking a resisting suspect once is not the same as striking him ten times.’ ” Maj. Op., p. 529 (quoting Cyrus, 624 F.3d at 863). “It’s the totality of the circumstances, not the first forcible act, that determines objective reasonableness.” Cyrus, 624 F.3d at 863. Under the totality of circumstances, however, whether four shots was too many was a question properly presented to the jury. The standard for judgment as matter of law is stringent. See Schandelmeier-Bartels v. Chi. Park Dist., 634 F.3d 372, 376 (7th Cir.2011). We review “the record as a whole to determine whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed.” Clarett v. Roberts, 657 F.3d 664, 674 (7th Cir.2011) (quotations omitted). We must construe the facts strictly in favor of the party who prevailed at trial, Schandelmeier-Bartels, 634 F.3d at 376, and “will overturn the jury’s verdict only if no reasonable juror could have found in the defendants’ favor,” Clarett, 657 F.3d at 674.
After hearing testimony from Phillips, Officer Hoffman, and Lieutenant Jack and weighing the evidence, a properly instructed jury found that Phillips failed to prove that the defendants’ use of force was excessive from the perspective of a reasonable officer facing the same circumstances that the defendants faced on the night of November 11. The jury was instructed to consider “the need for the use of force; the relationship between the need for the use of force and the amount of force used; the extent of the plaintiffs injury; any efforts made by the defendant to temper or limit the amount of force; the severity of the crime at issue; the threat reasonably perceived by the officers; whether the plaintiff was actively resisting arrest or was attempting to evade arrest by fleeing.” (Doc. 145, pp. 10-11). Respectfully, I disagree with my majority colleagues and believe that if all the evidence and all reasonable inferences are construed in favor of the defendants, as we must, a reasonable jury could find that the officers’ repeated use of force was not excessive.
This is not a case like Cyrus where the officers’ use of repeated force resulted in the death of an individual who was passively resisting arrest and posed no continuing threat to the officers’ safety. See Cyrus, 624 F.3d at 858 (question of fact existed where unarmed arrestee died after re *534 peatedly being tasered while laying face down on the pavement); see also Griffith v. Coburn, 473 F.3d 650, 653, 658 (6th Cir.2007) (question of fact existed where officers’ use of neck restraint resulted in death of unarmed arrestee who was only passively resisting by trying to put his arm behind his back and refusing to help or cooperate in any way with officers’ commands).
In this case, the officers used intermediate force that resulted in no severe permanent injuries; Phillips was left with scarring from the incident but she doesn’t walk with a limp or have any existing pain. (Tr. p. 66). The SL6 is a less-lethal force to be targeted at an area below the groin and is designed to impede suspects, not to cause great bodily harm. (Tr. pp. 97, 300). Officer Hoffman testified that he was trained to use the weapon for “resistive, assaultive, or otherwise dangerous behavior,” (Tr. p. 128), and they decided to use this weapon particularly so they could maintain a safe distance from the vehicle (Tr. pp. 221-23, 227, 300). The SL6 has the equivalent of a .44 magnum pistol black powder primer (Tr. p. 126), but travels at a lower velocity than a bullet fired from a magnum cartridge, and thus, has the level of force of a hand baton (Tr. p. 100) or professionally thrown baseball, see also Mercado v. City of Orlando, 407 F.3d 1152 (11th Cir.2005) (“The Sage Launcher is a ‘less lethal’ munition that fires a polyurethane baton that is 1.5 inches wide, travels approximately 240 feet per second, and delivers a force of 154 foot/pounds of energy-approximately the energy of a professionally-thrown baseball.”). I am not suggesting that the use of force in this case was insignificant, but it certainly resulted in lesser force than that used in Cyrus and Griffith.
I do not disagree with the majority that the use of an SL6 could be treated “as a species of deadly force,” Maj. Op., p. 521 (citing Bell v. Irwin, 321 F.3d 637, 639 (7th Cir.2003)), but that depends on how the weapon is used, see Mercado, 407 F.3d at 1157 (aiming at a person’s head constitutes deadly force), and in this case was a question of fact properly reserved for the jury. See Omdahl v. Lindholm, 170 F.3d 730, 733 (7th Cir.1999) (finding that whether bean-bag rounds constitute deadly force was a factual question for the jury). The officers were trained to use the SL6 in a less-lethal manner so as not to cause serious bodily harm and that’s how it was used to gain Phillips’s compliance. See, e.g., Bell, 321 F.3d at 639 (“Bean-bag rounds are designed to stun and inflict blunt trauma, knocking a person down but not penetrating the skin or damaging internal organs more severely than a kick or punch would.”). Phillips undisputedly suffered a painful injury and one shot did penetrate her skin requiring stitches, but after three weeks she was able to walk without a cane and had no permanent physical effects (aside from scarring). I disagree though with the majority’s implication that the SL6 necessarily employs a substantially greater degree of force than other weapons categorized as,“less lethal,” such as tasers. Certainly depending on the manner used, a taser or other restraint techniques could cause more injury than Phillips suffered. See, e.g., Cyrus, 624 F.3d at 858 (use of taser); see also Abdullahi, 423 F.3d at 768-68 (use of kneeling restraint).
I am not suggesting that force is appropriately used in all situations in which suspects do not comply with police orders or that a passive resister can be ruthlessly beaten into submission. But we have previously found some use of force reasonable against suspects who are resisting arrest by failing to comply with police orders. See, e.g., Padula, 656 F.3d at 603-04 (given the officers’ reasonable belief that driver was intoxicated, they were entitled to forcibly remove suspect from car when he *535 failed to comply with commands to get out); see also Monday v. Oullette, 118 F.3d 1099, 1104-05 (6th Cir.1997) (use of pepper spray reasonable where officer warned that he would discharge it if individual did not cooperate); Forrester v. City of San Diego, 25 F.3d 804, 807-09 (9th Cir.1994) (finding no Fourth Amendment violation when officers used injury-causing pain compliance techniques on passively resisting demonstrators). Officers may consider a suspect’s refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect’s compliance. See Mecham v. Frazier, 500 F.3d 1200, 1205 (10th Cir.2007) (officer’s use of pepper spray during traffic stop to force motorist from her vehicle was objectively reasonable under the circumstances where she disobeyed officer’s orders to exit the car); see also Mattos v. Agarano, 661 F.3d 433, 450 (9th Cir.2011) (en banc) (officers can consider passive refusal to comply with officer’s requests in using force). The amount of force reasonable is dependent on the totality of circumstances.
Before using force, the officers in this case tried repeatedly for ten minutes to gain Phillips’s compliance. Then, at a distance of 40 or 50 feet, Officer Hoffman fired a warning shot, leaving a baseball-sized dent in the driver-side door. The officers continued issuing commands and after five minutes with no response, Officer Hoffman fired the SL6 at Phillips’s leg. She yelled out in pain and reached down for her legs, but still didn’t comply with the officers’ commands. After waiting fifteen seconds, Officer Hoffman fired three more times, again hitting Phillips in the legs. After each shot, Officer Hoffman waited a few seconds for Phillips to comply; she had no further reaction until the fourth shot. After the fourth shot, Phillips finally complied.
While there may not have been an “immediate” or “urgent” need to get Phillips away from the vehicle, the practicalities of the situation required prompt action. This was a Friday night at 7:00 p.m. and the Waukesha police had deployed seven squad cars to the scene. Officers shouldn’t be required to take an endless “wait and see” approach under these circumstances, particularly where officers are presented with a potentially dangerous situation and may be called away to respond to other emergencies. “It is easy in retrospect to say that officers should have waited, or should have used some other maneuver — these propositions cannot be falsified — but Graham makes it clear that the fourth amendment does not require second-guessing if a reasonable officer making decisions under uncertainty and the press of time would have perceived a need to act.” Bell, 321 F.3d at 640.
The officers used non-lethal force to obtain Phillips’s compliance with their commands after assessing the situation and determining that it was the best option. Similarly in Clarett, 657 F.3d at 674-75, we upheld a jury verdict in favor of an officer who used a Taser on the plaintiff three times after she blocked the doorway to her son’s bedroom where other officers had already entered. The officer heard a commotion in the bedroom and believed that the officers needed help. Id. at 675. He told the plaintiff to move from the doorway and she refused, so he used the Taser to temporarily immobilize and remove her from the doorway. Id. The officer “said he considered using other alternatives, such as physically moving [the plaintiff] out of the way, but because the apartment was small and crowded, a physical confrontation might escalate quickly, risking serious injury. Under the circumstances, [the officer] concluded that using the Taser was his best option.” Id. The second and third *536 Taser deployments were in response to plaintiffs’ assaultive behavior. Id.
After Phillips complied with their commands, no further force was necessary and no further force was used. I also do not suggest that the reasonableness of force is measured by whether it is successful at gaining compliance. As noted above, the officers couldn’t simply keep shooting the baton launcher until they gained compliance; at some point the amount of force becomes excessive. But the officers were trained to use the SL6 in an overload fashion, meaning to repeatedly strike the same area. (Tr. p. 100). That’s how Officer Hoffman and Lieutenant Jack used the weapon against Phillips so they could safely take her into custody. It was not unreasonable for the officers to use the SL6 in this fashion, and “[i]n light of our hesitation to second-guess the snap judgments made by law enforcement personnel,” see Padula, 656 F.3d at 604, I would affirm the district court’s denial of the plaintiffs motion for judgment as a matter of law, thereby allowing the jury’s verdict to stand.
I concede that the majority opinion ably demonstrates that this arrest could have been better handled. And it is extremely unfortunate that Phillips was injured during these events. But, as noted, these facts present a close case and because of that, even if there were some basis to undo the jury’s verdict, for a second reason, I think the judgment of the district court should be affirmed: the officers should be entitled to qualified immunity. “Since the purpose of qualified immunity is to protect public officials from guessing about constitutional developments at their peril, the plaintiffs have the burden of showing that the constitutional right was clearly established.” Gonzalez v. City of Elgin, 578 F.Sd 526, 540 (7th Cir.2009). To be clearly established, the “contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.” McAllister, 615 F.3d at 884-85 (quotations omitted).
The SL6 was a relatively new weapon for use in the field by the Waukesha police department; Officer Hoffman had never used it in the field prior to this incident and was not aware that it could penetrate the flesh. (Tr. pp. 128-29). The only case identified by the parties involving the use of an SL6 was Mercado, 407 F.3d 1152, decided several months before Phillips’s arrest. The officer in that case fired the SL6 at the plaintiffs head from six feet away, but claimed he was aiming for the plaintiffs shoulder Id. at 1155. Because the circumstances didn’t warrant use of lethal force, the court held that there was a question of fact for trial whether the officer using the SL6 aimed for the plaintiffs head. Id. at 1157-58, 1160. In this case, the officers used the SL6 as a nonlethal weapon to gain the suspect’s compliance from a safe distance. The weapon was carefully aimed to strike only Phillips’s legs. There was no clearly established law alerting the officers that their actions in this instance were unlawful. Nor does the record show that the defendants were aware of similar injuries resulting from uses of the SL6 as it was designed to be utilized.
The majority is correct that by using a new type of weapon officers “do not get a free pass to use it in any manner until a case from the Supreme Court or from this circuit involving that particular weapon is decided.” Maj. Op., p. 528. Certainly, qualified immunity doesn’t give officers a *537 green light to use new weapons in any unreasonable manner, but it does absolve them of personal liability where they acted cautiously (maybe too cautiously) in a close case requiring judgment calls. See Mattos, 661 F.3d at 450 (applying qualified immunity where there was no Supreme Court decision or decision of the court of appeals addressing the use of a taser in dart mode). “[T]he point of qualified immunity and its ‘clearly established’ requirement is that government officials are not, as a rule, liable for damages in close cases.” Kikumura v. Turner, 28 F.3d 592, 597 (7th Cir.1994). “[Qualified immunity provides ‘ample room for mistaken judgments’ and protects government officers except for the ‘plainly incompetent and those who knowingly violate the law.’ ” Saffell v. Crews, 183 F.3d 655, 658 (7th Cir.1999) (quoting Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).
The officers in our case were dealing with a suspected stolen vehicle situation (it was at least reasonable for them to proceed under that assumption) and a driver who had endangered the lives of others before driving off the road in a residential area at night. The vehicle, which the officers had reason to believe was running, was facing them and the driver was, to say the least, unpredictable. Because of the high-risk nature of the stop, the officers determined that it was not safe and against normal procedure to approach the vehicle to physically remove the suspect, particularly given the number of uncertainties with the situation. So they instead decided to use non-lethal force to gain compliance. Significant resources were being utilized to control the situation and it was reasonable for the officers to decide that waiting it out was not a viable option.
Police officers must have the ability to make on-the-scene judgment calls that protect their safety and the safety of the public. That’s what the officers attempted to do in this situation and there was no existing legal precedent warning them that their actions were unlawful. This is different from the cases cited by the majority where police used excessive force after the suspect was in their control. Maj. Op. p. 529 (citing Rombo v. Daley, 68 F.3d 203, 207 (7th Cir.1995) (suspect was handcuffed) and St. John v. Hickey, 411 F.3d 762, 766 (6th Cir.2005) (forcing plaintiff who couldn’t bend his legs because of muscular dystrophy into back of police car)). Recently, in Brooks v. City of Aurora, 653 F.3d 478, 487 (7th Cir.2011), we held that officers were entitled to qualified immunity when they used pepper spray against the plaintiff a second time after he stopped resisting arrest. In that case, we noted that the pepper spray was not applied until Brooks had ceased back peddling from the officers and was passively facing them. Id. We held that it would not have been obvious to a reasonable police officer that the application of pepper spray was unlawful. Id. The suspect had ceased active, physical resistance but had not submitted to authority, had not been taken into custody, and could arguably pose a threat of flight or further resistance. Id. Although Phillips had not actively resisted arrest in a physical way, the officers here were similarly presented with a threatening situation because Phillips had not submitted to their authority and had not yet been taken into custody. Accordingly, given the totality of the circumstances as explained above, I believe the officers should at least be entitled to qualified immunity.
For the foregoing reasons, I respectfully dissent and would affirm the judgment in favor of the officers.

. When the defendants moved for summary judgment on Phillips’s excessive force claim, Phillips didn’t file a cross-motion for summary judgment, but instead, responded that there were genuine issues of fact for the jury. (Doc. 51, p. 33) (“[Tjhere are two distinct versions of the facts here, including several material issues for the jury which will bear directly on the 'reasonableness inquiry.' "). In fact, Phillips waited until two separate juries failed to find in her favor before claiming that she should win as a matter of law. (The first jury to try the case was unable to reach a verdict.)