In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1654

TAMARA PHILLIPS,

*Plaintiff-Appellant,*

*v.*

COMMUNITY INSURANCE CORPORATION, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:06-cv-01041—**William E. Callahan, Jr.,** *Magistrate Judge.*

ARGUED OCTOBER 25, 2010—DECIDED APRIL 27, 2012

Before WOOD, WILLIAMS, and TINDER, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Tamara Phillips contends that police officers used excessive force in arresting her when they shot her four times in the leg with an SL6 baton launcher after she disregarded their orders to come out of her car. Phillips's case was tried to a jury, which returned a verdict in the officers' favor. Phillips appeals, contending that the district court erroneously denied her post-verdict motion for judgment as a matter

of law. Because we find that the officers used excessive force and are not entitled to qualified immunity, we reverse.

## I. BACKGROUND

The facts in this case are largely undisputed. Around 7:00 p.m. on November 11, 2005, Lieutenant Russell Jack and Officer James Hoffman from the Waukesha Police Department received a dispatch reporting a possibly intoxicated driver. The original caller described a black car that was "all over the road." After running the car's plates, police dispatch initially informed officers that the plates "hit" to a black Nissan Maxima that had been reported stolen.

Shortly afterward, a responding officer, Brandon Pierce, pulled up the stolen vehicle record from his squad car and called in to note that the "hit" was to a car with the same license plate number but a different color, make, and model—a silver Honda Civic. The police dispatcher noted the discrepancy, stating that the original caller had specified that the drunk driver was in a black Nissan Maxima. Lieutenant Jack asked the dispatcher to contact the original caller to verify the car's color and make. Though the caller could not be reached, the dispatcher checked the vehicle record again and alerted officers that, "the listed owner on the Nissan Maxima is the complainant for the vehicle theft on the Honda Civic, silver in color with that plate assigned. So I am unsure why that plate is reassigned to the Nissan Maxima." Both cars were registered to the

same person: Tamara Phillips. Officer Hoffman later testified that there was confusion surrounding the car, the license plates it bore, and the fact that the plates "hit" to a different vehicle.[1]

Within several minutes of receiving the dispatch, the officers located the black Nissan Maxima, with its door ajar, on a sidewalk near an apartment complex. The driver had backed the car into a hedgerow. Behind the hedgerow, there was an electrical box and a five-foot drop-off into a neighboring parking lot. It is unclear whether the car was still running, but the officers testified that they believed it was because its lights were on.

Officer Hoffman stated that the incident was treated as a "high-risk traffic stop" because the car was believed to be stolen, had stopped in a residential area, and was pointed toward the street in the direction of the officers. During a high-risk traffic stop, instead of walking up to a car and exposing themselves to potential danger, the officers will order the driver to shut off the car, put the keys outside, step out, and walk to a safe location where the person can be placed in custody.

With the help of several other officers who had since arrived at the scene, seven squad cars were strategically

---

[1] It was later determined that Phillips had bought the Nissan Maxima, after her other car, the Honda Civic, was stolen. The Department of Transportation had reissued the same license plate number for the new Nissan Maxima despite a general policy barring reuse of license plate numbers from stolen cars.

placed around the Nissan Maxima. Once the squad cars were in place, Lieutenant Jack radioed the dispatch and said, "We have the person secured here, not in handcuffs, but stabilized in the car." Officer Hoffman pointed his squad car's headlights and spotlight toward the vehicle to illuminate its interior. He saw one person inside—a female driver who, at least initially, was moving about inside the car.

The officers, who were equipped with body shields for protection, identified themselves as police and loudly commanded the driver to show her hands and get out of the car. The driver did not comply, but instead reached for a compartment in the vehicle and lit a cigarette. At one point, the driver put both of her feet out of the driver-side window onto the door, resting them near the side-view mirror, while she leaned back toward the center console. She also picked up a water bottle and set it on the ground beside the car.

The officers estimated that they gave orders to the driver continuously for ten minutes before deciding to use their SL6. The SL6 Baton Launcher is a shoulder-fired, semi-automatic firearm that fires polyurethane bullets with a force equivalent to a .44 magnum pistol. Its use has been deemed "less lethal" by the Waukesha Police Department's use of force policy, and is considered tantamount to using a bean-bag shotgun or a hand baton. The "target area" for an SL6 is below a person's belly button, excluding the groin. The officers testified that the SL6 is designed to be used against persons exhibiting resistive, assaultive, or other dangerous behavior.

Officer Hoffman was 40 to 50 feet away from Phillips's car when he fired a warning shot, which hit the vehicle with a loud bang and left a baseball-sized dent on the driver-side door. The officers then waited five minutes while they issued commands ordering the driver to get out of the car. At this point, the driver was lying on the front seat toward the center console with her bare legs outside the front driver-side door of the car and her feet on the ground.

When the driver did not comply, the officers aimed at her leg and fired. A few seconds later, the driver yelled out in pain and reached down to her legs, but she did not pull them back into the car or otherwise attempt to protect herself. Another fifteen seconds passed and the officers fired again. The driver did not move. The officers waited another three seconds and shot again. The driver again did not move. After another three seconds, the officers fired again, hitting her a fourth time. This time, the driver complied by "slumping" out of the car and kneeling on the ground. Lieutenant Jack then ordered the driver to stand back up and walk backwards toward him or she would be shot again. The driver did as she was told and the officers arrested her.

Plaintiff-Appellant Tamara Phillips, who turned out to be the very drunk driver—yet lawful owner of the car, sustained two injuries on the inside of her lower right leg in the ankle area and two other injuries to her upper left leg. The most serious injury was to her right ankle, where one of the bullets left a six-inch wound requiring thirty stitches because the flesh was torn from the bone.

Phillips, who works as a personal trainer, was unable to walk for a week, and walked with a cane for approximately three weeks.

On September 5, 2006, Phillips sued, claiming that the officers had used excessive force in arresting her. The case was tried twice. The first trial ended in a deadlocked jury and the court declared a mistrial. The second trial resulted in a verdict for the officers. After the verdict, Phillips moved for judgment as a matter of law, or, in the alternative, for a new trial. The court denied the motion. This appeal followed.[2]

---

[2] We note that Phillips did not move for judgment as a matter of law before the case was submitted to the jury as required by Federal Rule of Civil Procedure 50(a)(2). Normally, a party that does not move for judgment as a matter of law before the case goes to a jury loses the opportunity to make this motion after the verdict. *See Collins v. Illinois*, 830 F.2d 692, 698 (7th Cir. 1987). Here, however, the defendants waived objection to Phillips's procedural default by failing to raise this issue on appeal. *See id.* (considering judgment as a matter of law even though the plaintiff did not move for a "directed verdict" under Rule 50(a) because defendant failed to object); *see also Williams v. Runyon*, 130 F.3d 568, 572 (3d Cir. 1997) ("Six of our sister circuits have held that where a party did not object to a movant's Rule 50(b) motion specifically on the grounds that the issue was waived by an inadequate Rule 50(a) motion, the party's right to object on that basis is itself waived.") (citing cases). Even after *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006), which reemphasized the strict requirements of Rule 50, we have held

(continued...)

## II. ANALYSIS

We review a district court's denial of a motion for judgment as a matter of law de novo, asking whether the evidence presented, combined with all reasonable inferences permissibly drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict. *Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132, 1139 (7th Cir. 1992). For Phillips to be entitled to judgment as a matter of law, the officers must have used excessive force in arresting Phillips in violation of her Fourth Amendment right to be free from unreasonable searches and seizures. *See McAllister v. Price*, 615 F.3d 877, 884 (7th Cir. 2010). Furthermore, for Phillips to prevail, the officers must not be entitled to qualified immunity for their conduct.[3] *See*

[2] (...continued)

that "[a party's] challenge to [the opposing party's] failure to adhere to the procedural requirements of Rule 50(a) . . . is waivable*." See Wallace v. McGlothan*, 606 F.3d 410, 418-19 (7th Cir. 2010) (noting the Supreme Court's decision in *Unitherm*).

[3] Phillips briefly contends, without citing any authority, that whether the officers are entitled to qualified immunity is not properly before us because, although the officers moved for judgment as a matter of law under Rule 50(a) before the jury rendered its verdict, the officers did not renew their motion after the verdict under Rule 50(b). But there was no need for the officers to renew their motion because they were the prevailing parties, having obtained a jury verdict in their favor. *See* Advisory Committee Notes to Rule 50 (noting that

(continued...)

*Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

## A. Constitutional Violation

The nature and extent of force that may reasonably be used to effectuate an arrest depends on the specific circumstances of the arrest, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest. *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009). We must also bear in mind when considering the totality of the circumstances that "police officers

---

(...continued)
"a jury verdict for the moving party moots the issue"). It would waste time and resources to require a party to move for judgment as a matter of law under Rule 50(b), formerly denominated "judgment *nothwithstanding* the verdict," if that party has obtained a jury verdict in its favor.

are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. This constitutional inquiry is objective and does not take into account the motives or intent of the individual officers. *Id.*

Objective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide. *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003). We defer to a jury's determination of what occurred during an arrest or whose testimony is credible. But a constitutional tort is not "an analog of civil negligence." *Id*. In a traditional negligence case, we permit the jury to determine whether conduct was reasonable under the circumstances. In an excessive force case, while we accept the factual inferences made by the jury, we must independently review the jury's interpretation of what is reasonable under the Fourth Amendment. *Id.*; *cf. Ornelas v. United States*, 517 U.S. 690, 697 (1996) ("A policy of sweeping deference [by appellate courts to factfinders' determinations of probable cause] would permit . . . the Fourth Amendment's incidence to turn on whether different [factfinders] draw general conclusions that the facts are sufficient or insufficient to constitute probable cause. Such varied results would be inconsistent with the idea of a unitary system of law." (internal quotation marks, alterations, and citation omitted)).

Independent review is particularly warranted when, as here, the material facts of the case are essentially

uncontroverted. Although she testified at trial, Phillips was unable to offer a description of the arrest because she had very little memory of the incident and could only "recall bits and pieces." The officers' account was the only complete version provided to the jury and it did not conflict with Phillips's testimony. Any ambiguities in the record we construe in the defendants' favor.[4]

---

[4] The dissent argues that judgment as a matter of law is unwarranted "because the evidence surrounding [an] officer's use of force is often susceptible of different interpretations." Dissent Op. at 33 (quoting *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010)). We certainly agree that summary judgment is frequently inappropriate in excessive-force cases. But we do not agree that there are conflicting interpretations of the record that support the amount of force used in this case. *Abdullahi v. City of Madison* is not to the contrary. 423 F.3d 763 (7th Cir. 2005). In *Abdullahi,* an arrestee suffocated from a lung injury of unknown origin. Medical experts offered dueling testimony at trial as to whether the arresting officers' use of force could have caused the severe lung trauma. *Id.* at 766-67. Reversing the district court, we held that it was for the jury to infer whether officers caused the injury by kneeling on the arrestee's back or whether the injury was sustained prior to a struggle with police. *Id.* at 769-70. The current case does not present a similar set of competing facts or inferences. Consequently, "whether four shots was too many under the circumstances" is not a question of factual inferences but a determination of what is objectively reasonable under the Fourth Amendment. Dissent Op. at 34. When warranted, we and our sister circuits have reconsidered jury verdicts in favor of officers for violations of the

(continued...)

This leaves us to consider the core constitutional question: whether use of multiple shots from an SL6 weapon to secure a non-resisting, intoxicated arrestee amounted to excessive force under these circumstances.

Phillips contends that the *Graham* factors weigh in her favor because she posed no immediate threat to anyone during the arrest, offered no resistance, and made no attempt to flee. The defendants argue that their use of the SL6 was justified because Phillips was drunk, may have been driving a stolen car, and presented a potential threat to the officers and the community.

### 1. Amount of Force Employed by the SL6 Weapon

To determine whether a constitutional violation has occurred, we first evaluate the level of force used to arrest Phillips. The record establishes that the force exerted by an SL6 bullet is roughly comparable to a projectile from a bean-bag shotgun. Other courts of appeals have observed that baton launchers and similar "impact weapons" employ a substantially greater degree of force than other weapons categorized as "less lethal,"

---

[4] (...continued)

Fourth Amendment. *See Campbell v. Miller*, 499 F.3d 711, 718-19 (7th Cir. 2007) (reversing jury verdict on reasonableness of strip search in public); *see also Manzanares v. Higdon*, 575 F.3d 1135, 1144 (10th Cir. 2009) (reversing jury verdict on probable cause); *Mitchell v. Boelcke*, 440 F.3d 300, 303 (6th Cir. 2006) (reversing jury verdict on reasonable suspicion to detain plaintiff).

such as pepper spray, tasers, or pain compliance techniques. In *Deorle v. Rutherford*, the Ninth Circuit considered a bean-bag shotgun projectile as "something akin to a rubber bullet." 272 F.3d 1272, 1280 (9th Cir. 2001). *Deorle* concluded that "the cloth-cased shot constitutes force which has the capability of causing serious injury, and in some instances does so." An officer provided expert testimony that a "Use of Force Continuum . . . would list an impact weapon high on the schedule of force" and that "[i]t would be unreasonable for an officer to use an impact weapon on an unarmed person." *Id.* at 1280 & n.17 "Such force is much greater than that applied through the use of pepper spray . . . or a painful compliance hold . . . ." *Id.* at 1279-80 (citations omitted); s*ee also Thompson v. City of Chicago*, 472 F.3d 444, 451 & nn.18-19 (7th Cir. 2006) (officer testimony regarding Chicago Police Department policies limiting use of "impact weapons" to "high-level, high-risk assailants" and describing such weapons as "unwarranted against a suspect resisting arrest" by punching and struggling); *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005) (observing that the SL6 weapon "is classified as a 'less lethal' munition, [but that local] police regulations recognize that it can be used as a deadly weapon.").

In *Bell*, the district court treated bean-bag rounds used by officers "as a species of deadly force." 321 F.3d at 639. But we found the record insufficient to determine whether such rounds should be considered deadly as a matter of law; we concluded only that they were "less lethal than bullets or buckshot." *Id.*; *see also Omdahl v.*

*Lindholm*, 170 F.3d 730, 733 (7th Cir. 1999) (declining to resolve parties' dispute over "whether the use of bean bag projectiles constituted deadly force or merely a higher level of force along a ladder of escalating force.")

"For a particular application of force to be classified as 'deadly,' it must at least carry with it a substantial risk of causing death *or serious bodily harm*." *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (emphasis added) (internal quotations marks and citations omitted). Direct analogy to the above cases cannot be dispositive because impact weapon technology varies from case to case, as do the manner and circumstances when officers deployed impact rounds. Nevertheless, multiple SL6 shots fired with force equivalent to a .44 magnum pistol at the same part of an arrestee's body clearly have the potential to cause serious injury, even when aimed at the lower body. Indeed, this is what happened to Phillips when the SL6 rounds tore flesh from her ankle, requiring a lengthy, painful recovery. As in *Bell*, this record does not permit us to determine whether multiple SL6 rounds aimed at the lower body carry a substantial risk of serious bodily harm *per se*. But we conclude from the case law and from the extent of Phillips's injuries that the force used during her arrest was at least on the high-end of the spectrum of less-lethal force. In other words, when balancing the "nature and quality of the intrusion" against the "governmental interest at stake," we conclude that the intrusion upon

Phillips's Fourth Amendment rights was significant.[5] Such force, whether or not it inherently carries a substantial risk of serious bodily harm, "is not to be deployed lightly." *Deorle*, 272 F.3d at 1272, 1279.

In *Smith v. Ball State University Board of Trustees*, we considered an excessive force claim brought by a plaintiff who drove onto a sidewalk and nearly hit several pedestrians while suffering from diabetic shock. 295 F.3d 763 (7th Cir. 2002). After the driver failed to respond when police arrived at the scene, the officers pulled him from the car. *Id.* at 766. We found that officers reasonably believed the driver to be drunk and "were justified in using force to remove him, particularly given the potential threat to public safety of an intoxicated driver in command of a running vehicle." *Id.* at 770. Although he "was not actively resisting" during the arrest, we held that "a reasonable officer who happened on the scene could reasonably misconstrue [the driver's] *unresponsiveness as resistance requiring the minimal use of force*." *Id.* at 771 (emphasis added); *see also McAllister*, 615 F.3d at 883 (finding material issue of fact over constitutionality of force used on semiconscious arrestee).

---

[5] The amount of force inflicted by four SL6 shots further distinguishes this case from those the dissent relies upon involving use of pepper spray and pain compliance holds. Indeed, in *Padula v. Leimbach*, we noted that "as a means of imposing force, pepper spray is generally of limited intrusiveness." 656 F.3d 595, 603 (7th Cir. 2011) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002)). The same cannot be said of the force used upon Phillips.

The SL6 shots used on Phillips plainly exceeded the "minimal" force permitted for the suspected drunk driver in *Smith*.

### 2. Whether Officers Reasonably Believed Phillips's Car Was Stolen

*Smith* differs from this case in that the officers who arrested Phillips testified that they believed she was driving a stolen car. There was plainly some confusion about the status of the vehicle on the night of the arrest. But the officers contend on appeal that they never received any information contradicting the initial report that Phillips's black Nissan was stolen. This is incorrect. Officer Pierce checked the stolen vehicle record and alerted his colleagues that a silver Honda Civic had been reported stolen instead of the Nissan.[6] Before officers found Phillips, the dispatcher confirmed the initial mistake and attempted to clarify the confusion: "[T]he listed owner on the Nissan Maxima is the complainant for the vehicle theft on the Honda Civic, silver in color with that plate assigned. So I am unsure

---

[6] After dispatch reported the Nissan stolen, Officer Pierce called in for "verification," asking whether "the hit is on a Honda Civic or Maxima," and noting that "the plate number is on a Civic." Pierce also inquired, "the caller said the car was black for sure? The hit is showing silver." The dispatcher acknowledged the discrepancy, confirming that the caller who reported the drunk driving had "stated it was a black Nissan Maxima."

why that plate is reassigned to the Nissan Maxima." In other words, the officers were advised that the license plate number was associated with two cars: a silver Honda Civic that had been reported stolen and a black Nissan Maxima with no report of being stolen but with plates "reassigned" from the Honda. The defendants admitted at trial that, before they located Phillips, the dispatcher had clarified that "the Honda Civic was the original stolen vehicle" and that there was no "information . . . that the black Nissan Maxima was stolen."

We do not doubt or reconsider the officers' testimony that they continued to believe they were dealing with a stolen car. But the question remains whether it was objectively reasonable for them to proceed on this assumption in the face of the contradictory information they received. At trial, Lieutenant Jack testified that the police continued to treat Phillips's black Nissan as stolen because the Department of Transportation had a general policy prohibiting reassignment of plates from stolen cars to other vehicles. He also testified that the discrepancy in the car's reported color did not concern him because owners often repaint their cars without updating vehicle records with the Department of Transportation. This may be true but it misses the essential point: On the night of the arrest, the officers never encountered the Honda Civic confirmed as the stolen vehicle. Though a car owner might repaint a vehicle without updating public records, this would not change the car's make and model. And even if the Department of Transportation would not typically reassign stolen license plate numbers to another car, this does not alter

the fact that officers were advised a Honda had originally been stolen rather than the Nissan with the reported drunk driver. No department policy could transform a Honda Civic into a Nissan Maxima. To continue believing Phillips was driving the car originally reported stolen, officers had to disregard the caller's description of a different vehicle, as well as their own direct observation of the Nissan Maxima during the 15-minute standoff with the drunken Phillips.[7]

The conflicting information officers received could cause legitimate confusion, but at a certain point continuing confusion becomes objectively unreasonable. After the officers made the initial determination that they were dealing with a car theft, they appear to have had difficulty acknowledging subsequent information challenging their assumption. This is not because the officers were unaware of the discrepancy. The transcript shows Lieutenant Jack engaged in communications over the dispatch, with some transmissions directed to his personal call number. Lieutenant Jack considered con-

---

[7] Phillips also raises a puzzling argument that officers should not have considered her car stolen because the dispatch had made it clear that Phillips was the legal owner of both the Honda and the Nissan. The defendants respond, quite rightly, that they had no way of knowing who was driving the car at the time of the arrest. But this dispute is immaterial. Regardless of the driver's identity, the question is whether officers reasonably believed the black Nissan was stolen after police dispatch informed them that a silver Honda had been stolen instead.

tacting the original caller again to check whether he may have misidentified the car as a black Nissan Maxima. "It is not objectively reasonable to ignore specific facts as they develop (which contradict the need for this amount of force), in favor of prior general information about a suspect." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666 (10th Cir. 2010); *cf. Fisher v. Harden*, 398 F.3d 837, 843 (6th Cir. 2005) (finding it unreasonable for officer to rely on reported information to determine whether probable cause exists when direct observation or other information undermines the earlier report).

We take care to judge the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. We respect that the defendants' central priority on the night of the arrest was apprehending the reported drunk driver and we sometimes defer to officers' reasonable misunderstanding of a particular scenario. In spite of the contrary information the officers received, it could be considered reasonable to take additional precautions given the unusual circumstances surrounding the car's license plates. That is, the jury could have concluded that it was initially reasonable to approach Phillips's vehicle using the procedures associated with high-risk stops and to command Phillips to exit her car.

Nevertheless, at the time of the arrest, there was clearly sufficient information to call into question whether Phillips's car was stolen. No "magical on/off switch" controls the level of force permitted to effectuate an arrest. *Scott v. Harris*, 550 U.S. 372, 382 (2007); *Cyrus*,

624 F.3d at 863. The original police dispatch reporting a stolen black Nissan Maxima did not entitle officers to proceed on an unshakable assumption that they were pursuing a car thief. They could not simply ignore subsequent information that a different car had been stolen when they considered the appropriate amount of force to use. *Cavanaugh*, 625 F.3d at 666. Even if some understandable confusion and caution remained, we conclude that a reasonable officer would have been alert to the potential need to mitigate force in arresting the driver.[8] The officers' *certainty* that they were dealing with a car theft was objectively unreasonable in light of the contrary information they received.

### 3. Whether Officers Used Excessive Force in Shooting Phillips Four Times with the SL6 Weapon

Even if the officers acted reasonably in treating the arrest as a high-risk stop because of uncertainty surrounding the license plates, the force they used to apprehend Phillips exceeded the level that was reasonable under the circumstances. At trial, the officers stated repeatedly that they believed Phillips was drunk. Officer Hoffman testified that he initially suspected Phillips was passing

---

[8] By the same rationale, in a case like *Smith*, if a police dispatch alerted officers that a reported drunk driver also suffered from epileptic seizures, we would expect reasonable officers to take that information into account when weighing the force necessary to effectuate the arrest. *See McAllister*, 615 F.3d at 883.

in and out of consciousness, though he later dismissed this idea after seeing her move intermittently within the car. Regardless of whether they believed Phillips was conscious throughout the entire incident, the officers knew they were dealing with an arrestee of diminished capacity.

It is also clear that Phillips was never "actively resisting arrest," a touchstone of the *Graham* analysis. 490 U.S. at 396. Phillips never exhibited any sort of aggressive behavior toward the officers before or after they located her car, nor did she make any attempt to escape.[9] The officers argue that Phillips demonstrated continuous "defiance" by failing to follow their commands to exit the vehicle. This characterization strains credulity given the circumstances. But viewing the evidence in the light most favorable to the defendants, we presume that the officers reasonably believed that Phillips heard their orders and chose not to obey. Even so, leaving oneself exposed to repeated police fire does not represent "active resistance." To the extent that Phillips's perceived conduct could be considered "resistance" at all,

---

[9] The officers contend on appeal that Phillips "led them on a several mile chase through the City of Waukesha." This is plainly false. The uncontested evidence at trial established that the officers determined Phillips's location from a bus driver's call and then found the stationary vehicle on a sidewalk next to an apartment complex. Although the officers searched for the car for several minutes before receiving the tip from the bus driver, there was never any "chase."

it would have been passive noncompliance of a different nature than the struggling that we have found warrants escalation of force. Indeed, in *Smith*, we noted this distinction, finding that what the officers perceived as willful noncompliance was not the same as "actively resisting" but instead a passive "resistance *requiring the minimal use of force.*" 295 F.3d at 771 (emphasis added); *see also Cyrus*, 624 F.3d at 863 (no evidence suggesting that the plaintiff "violently resisted" officers even if plaintiff refused to release arms for handcuffing); *Estate of Escobedo v. Bender*, 600 F.3d 770, 780-81 (7th Cir. 2010) (plaintiff threatening suicide was not actively resisting arrest even though he said he was intoxicated, had a gun, and had barricaded himself in his room and refused to come out for three hours); *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (en banc) ("[W]e draw a distinction between a failure to facilitate an arrest and active resistance to arrest."); *Griffith v. Coburn*, 473 F.3d 650, 653, 659 (6th Cir. 2007) (use of chokehold on plaintiff who was leaning back but resisting only passively by trying to put arms behind his back and refusing to cooperate with officer's commands was unreasonable).

The officers have argued that Phillips continued to present a potential threat while she remained in the car because they believed the vehicle was running and could be used as a weapon. We have recognized this risk, *Smith*, 295 F.3d at 770, and agree that officers were entitled to use force to remove Phillips. But we have never suggested that any level of force is permissible to extinguish such a threat. *See McAllister*,

615 F.3d at 885-86. To the contrary, "[f]orce is reasonable only when exercised in proportion to the threat posed." *Cyrus*, 624 F.3d at 863 (citing *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009)). We must view the severe force that officers used on Phillips in light of the fact that any threat she presented had already been substantially contained. The officers had her vehicle surrounded with seven squad cars, and behind the vehicle there was a steep drop-off. There was nowhere for Phillips to go. Officer Hoffman himself told the dispatch that the driver was "secured, not in handcuffs, but stabilized in the car." The scene was "secured" at least fifteen minutes before officers shot Phillips. During that time, Phillips had given no indication that she intended to harm the officers or anyone else.

This is not to say that officers had entirely eliminated all danger after they surrounded the car. But the "desire to resolve quickly a potentially dangerous situation is not the type of government interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle*, 272 F.3d at 1281. The threat Phillips presented cannot be characterized as "immediate." *See Graham*, 490 U.S. at 396. When the officers decided to use the SL6, Phillips was sprawled across the front seat with her legs outside of the car and both feet on the ground. Even to move into a position to drive the car, Phillips would have had to, at a minimum, sit up, bring her feet in, close the car door, and press the gas pedal. Phillips never gave the officers a reason to believe that she was about to do any of these things, even after the officers fired a warning shot at her car door.

*Cf. Estate of Starks v. Enyart*, 5 F.3d 230, 233 (7th Cir. 1993) (finding officers improperly used deadly force and were not entitled to qualified immunity even though escaping arrestee recklessly drove stolen taxicab toward them). Other than taking her legs from the window and putting them outside the car's door, there was no escalation or change in circumstances that called for immediate action on the officers' part.

Under the totality of the circumstances, it is a close question whether officers acted reasonably in hitting Phillips with the first SL6 round. But the multiple shots fired certainly exceeded the level of force permissible to effectuate the arrest. Phillips gave no reaction to the first warning shot which put a baseball-sized dent in the car. Then, after the first physical blow, Phillips continued to remain in the same position, only yelling in pain after being injured. She did nothing to escalate the situation by actively resisting or attempting to flee. Although the officers waited little before firing additional shots, it was not because the circumstances called for rapid action. Since Phillips's only response had been to reach down to her leg and cry out in pain, the officers had time to pause and reevaluate the level of force needed to arrest her. *See Mattos*, 661 F.3d at 445 (noting that use of less-lethal force was unwarranted because there were no "exigent circumstances" and officers were able to "proceed[] deliberately and thoughtfully"); *cf. Brockington v. Lamont Boykins*, 637 F.3d 503, 507 (4th Cir. 2011) (although initial use of deadly force was reasonable, there was no indication that additional force was necessary after

the plaintiff had been shot, was on the ground, and wounded).

This was simply not the kind of "tense, uncertain, and rapidly evolving" situation that required "split-second" judgment calls. *Graham*, 490 U.S. at 397. As discussed above, the officers had already been put on notice that Phillips's car was not the same color, make, or model as the one reported stolen. When the car was located, according to the officers' testimony and the evidence in the record, Phillips appeared to be very drunk. Phillips never actively resisted or even re-sponded to the officers' initial use of force. Under the circumstances, it was objectively unreasonable to shoot Phillips four times with the SL6 when she posed no immediate threat and offered no active resistance.

There is a commonsense need to mitigate force when apprehending a non-resisting suspect, particularly when the suspect is known to have diminished capacity. An arrestee may be physically unable to comply with police commands. *See Smith*, 295 F.3d at 770; *see also Cyrus*, 624 F.3d at 863 (noting that officer was "aware of [arrestee's] mental illness"); *McAllister*, 615 F.3d at 883 (finding knowledge of arrestee's diabetic condition relevant to excessive force analysis); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004), ("The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.").

Here, we must respectfully disagree with our dissenting colleague who suggests that the force used was appro-

priate because Phillips failed to comply when officers ordered her to exit the car. Like the dissent, we accept the officers' testimony that their ultimate "goal" in using the SL6 was "to gain compliance and control," rather than to hurt or punish Phillips gratuitously. But this goes principally to the question of intent. "The officers' intent in using force is irrelevant in a Fourth Amendment case. Only its reasonableness matters—which means whether it was excessive in the circumstances, because if it was, it was unreasonable . . . ." *Richman v. Sheahan*, 512 F.3d 876, 882 (7th Cir. 2008) (citations omitted); *see also Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

The dissent notes that officers stopped firing after Phillips obeyed and slid out of the car. But the fact that Phillips eventually complied after she was shot has no bearing on whether the force exercised on her was reasonable. We concur with our dissenting colleague's statement that "the reasonableness of force [cannot be] measured by whether it is successful at gaining compliance." Dissent Op. at 46. But we believe the dissent's analysis of the officers' use of force effectively sanctions this invalid approach. That the officers had a reasonable goal and used (arguably) non-deadly force to accomplish it does not make their actions reasonable. It is true that the officers said they were trained to use the SL6 in an "overload" fashion meant to overpower a subject by repeatedly striking the same area of the

body. But as the dissent observes, the SL6 was re-served for "resistive, assaultive, or otherwise dangerous behavior." Phillips never exhibited any of the active resistance or assaultive behavior that would have war-ranted use of the overload tactic. Even when officers' goals are eminently reasonable, there are definite limits to the force officers may use to prod arrestees into obeying commands. A rule that pins reasonableness on whether officers used the force necessary to secure compliance would be a rule that *requires* officers to beat non-resisting arrestees into submission.

Moreover, we believe the dissent misapprehends the circumstances that warranted escalation of force in our prior cases. We have held that increased force may be reasonable when used in response to an arrestee's active struggling and in proportion to the threat pre-sented. Thus, in *Padula*, we found that "[i]t was . . . reason-able to use mace to attempt to control [the plaintiff] under the circumstances, which involved a physical struggle both before and after placing him in handcuffs." 656 F.3d at 603. The force used was carefully calibrated to the arrestee's active resistance: "as a means of imposing force, pepper spray is generally of limited intrusiveness." *Id.* Similarly, "[t]he Officers' use of batons was also reason-able. . . . [The] baton strikes were 'stern,' but not 'severe,' which was appropriate in response to [the plaintiff] kicking and flailing his arms." *Id.* Our decision in *Clarett v. Roberts* followed the same rationale. 657 F.3d 664 (7th Cir. 2011). There, an officer testified that he used three taser deployments because the arrestee was "kicking and flailing at him and continued this assaultive behavior

when he tried to arrest her." *Id*. at 675; *see also Monday v. Oullette*, 118 F.3d 1099, 1105 (6th Cir. 1997) ("Here, [the officer] used only a *single* burst of pepper spray to get plaintiff on the stretcher, unlike the allegation in [a separate case] that the plaintiff was unnecessarily sprayed a second time after he was subdued." (emphasis added)). Permitting substantial escalation of force in response to passive non-compliance would be incompatible with our excessive force doctrine and would likely bring more injured citizens before our courts. Under the totality of the circumstances, we conclude that the force used surpassed the level permissible under the Fourth Amendment to effectuate Phillips's arrest.

## B.  Qualified Immunity

Qualified immunity protects an officer from liability if a reasonable officer could have believed that the action taken was lawful, in light of clearly established law and the information the officer possessed at the time. *Omdahl*, 170 F.3d at 733. "In determining whether a right is "clearly established," we look first to controlling precedent on the issue from the Supreme Court and from this circuit. *Estate of Escobedo*, 600 F.3d at 781. If such precedent is lacking, we look to all relevant case law to determine "whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id.* (internal quotation marks and citation omitted). Even dicta, although we do not rely on it here, in certain cases, can clearly

establish a right. *See id.* at 786 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In undertaking this analysis, we take care to "look at the right violated in a particularized sense, rather than at a high level of generality." *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) (internal quotation marks and citation omitted). But a case directly on point is not required for a right to be clearly established and "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Therefore, we ask whether it was clearly established on November 11, 2005 that multiple trauma-inducing shots would constitute excessive force when used to secure a non-resisting, intoxicated arrestee. We conclude that the right to be free from this amount of force was clearly established on the date of Phillips's arrest.

The officers contend that they are entitled to qualified immunity because, on the date of the arrest, no case from the Supreme Court or from this circuit had held use of the SL6 unconstitutional. They argue that if the law had clearly established that use of an SL6 was unlawful, police departments would no longer retain the weapon in their arsenal.

The defendants misconstrue the qualified immunity analysis. "[T]here is no need that the very action in question [have] previously been held unlawful." *Safford Unified Sch. Dist. v. Redding*, 557 U.S. ___, 129 S. Ct. 2633, 2643 (2009) (internal quotation marks and citation omitted). Every time the police employ a new weapon,

officers do not get a free pass to use it in any manner until a case from the Supreme Court or from this circuit involving that particular weapon is decided. *See Sallenger v. Oakes*, 473 F.3d 731, 741-42 (7th Cir. 2007) (no qualified immunity for officers' use of hobble given totality of circumstances, even where other circuits had held that "use of a hobble was not clearly established as constitutionally suspect"). Even where there are "notable factual distinctions," prior cases may give an officer reasonable warning that his conduct is unlawful. *Estate of Escobedo*, 600 F.3d at 781; *see also Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007) ("[T]he [c]ourt can consider more than merely the factual context of a prior case: 'the general reasoning that a court employs' also may suffice for purposes of putting the defendant on notice that his conduct is clearly unconstitutional." (citation omitted)).

The officers also argue that qualified immunity is warranted because *Smith* affirmatively authorized use of force to remove an unresponsive driver from a car. 295 F.3d at 771. But the reliance on *Smith* is misplaced. As we explained in *McAllister*, *Smith* does not stand for the proposition that an officer may use any amount of force on an unresponsive driver. 615 F.3d at 885-86 (distinguishing *Smith* and denying qualified immunity to police officers because "the degree of force the officers intended to apply in *Smith* was significantly less than the force allegedly used by [the officer in this case]"). To the contrary, *Smith* permitted only "minimal" force to remove a non-responding intoxicated driver from his car. 295 F.3d at 771.

As stated above, "[f]orce is reasonable only when exer-
cised in proportion to the threat posed." *Cyrus*, 624 F.3d at
863 (citing *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir.
2009) (discussing clearly established law as of 2004)).
"Force also becomes increasingly severe the more often
it is used; striking a resisting suspect once is not the
same as striking him ten times." *Cyrus*, 624 F.3d at 863.
By the time of the arrest, circuit precedent had given the
officers notice that the force used on Phillips was exces-
sive. *Smith* indicated that only minimal force was war-
ranted to remove a driver perceived to be intoxicated and
passively resisting. 295 F.3d at 771. *Omdahl* referenced the
substantial quantum of force inflicted by a bean-bag
shotgun, treating it as either "deadly force" or "a higher
level of force along a ladder of escalating force." 170 F.3d
at 733; s*ee also Deorle*, 272 F.3d at 1279-80. Prior to Phillips's
arrest, the Eleventh Circuit held in *Mercado* that officers
had used excessive force in deploying an SL6 weapon
against an arrestee wielding a knife and threatening to
commit suicide. 407 F.3d at 1154-55. One of the two
SL6 rounds fired hit the arrestee in the head injuring
him. *Id.* The Eleventh Circuit rejected qualified immunity
for the officers even though there was no prior case
law that was "materially similar." *Id.* at 1159. Though
the circumstances surrounding the use of force differ
from the current case, *Mercado* recognized that the SL6
could be deployed in a clearly unlawful manner even
though it was categorized as "less lethal." *Id.* at 1157.[10]

---

[10] The officers rely on *Mercado* to argue that they are entitled
to qualified immunity because there was no "materially

(continued...)

Even assuming a lack of clarity about the propriety of shooting Phillips with the SL6 once, the officers should have known that it was unlawful to escalate force by shooting Phillips three more times when she was unresponsive, presented no immediate threat, and made no attempt to flee or even avoid police fire. That is, it was clearly established in November 2005 that officers could not use such a significant level of force on a non-resisting or passively resisting individual. *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) (denying qualified immunity where police forced a handcuffed, drunk driving suspect who was verbally resisting arrest into a police car by breaking the suspect's ribs); *St. John v. Hickey*, 411 F.3d 762, 772-75 (6th Cir. 2005) (denying qualified immunity to officers who injured a disabled plaintiff while placing him in police cruiser because, although the plaintiff was "cursing," "yelling," and "passively" resisting, he was not violent or attempting to flee); *Hill v. Miller*, 878 F. Supp. 114, 116 (N.D. Ill. 1995) ("[I]t is well established that the use of any significant force . . . not reasonably necessary to effect an arrest—as

---

[10] (...continued)

similar" case that "truly compels the conclusion that [the plaintiff] had a right established under federal law." *Mercado*, 407 F.3d at 1159. The argument is unavailing because *Mercado* itself found officers liable in spite of the absence of case law directly on point. And the Supreme Court had already rejected any "materially similar" requirement as an overly "rigid gloss" on qualified immunity. *Hope*, 536 U.S. at 739.

where the suspect neither resists nor flees or where the force is used after a suspect's resistance has been overcome or his flight thwarted—would be constitutionally unreasonable." (internal quotation marks and citation omitted)). We therefore conclude that the officers are not entitled to qualified immunity, and that Phillips is entitled to judgment as a matter of law on her excessive force claim.[11]

## III. CONCLUSION

We REVERSE the judgment and REMAND the case to the district court to enter judgment as a matter of law for Phillips and for a calculation of Phillips's damages.

---

[11] Because we conclude that Phillips was entitled to judgment as a matter of law, we do not consider whether she is entitled to a new trial because the district court admitted her blood alcohol content into evidence even though the officers were unaware of it when they shot her with the SL6.

TINDER, *Circuit Judge,* dissenting. I have no major quarrel with the majority's description of the facts and the applicable legal standards. I respectfully dissent, though, because I cannot agree that based on those facts, a reasonable jury had to find in favor of Phillips. Excessive force claims generally require a fact-based, case-by-case inquiry, and as such, we have often held that the question of whether force is excessive must be decided by a jury. *See, e.g., Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010); *McAllister v. Price*, 615 F.3d 877, 884 (7th Cir. 2010); *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). "[W]e have recognized that summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus*, 624 F.3d at 862. I am aware of no case before this one, however, where we have reversed a jury verdict in favor of a defendant officer by concluding that the officer's use of force under the totality of circumstances was excessive as a matter of law. The facts in this case should not lead us to such an extraordinary result.

Although most of the relevant facts in this case are undisputed, it is within the jury's province to determine what reasonable inferences to draw from those facts. *See Abdullahi*, 423 F.3d at 770 (stating that it is for the jury, not us, to weigh all the evidence and choose between competing inferences). I agree with the majority that the "[o]bjective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide," Maj. Op., p. 9, but the facts of this

case and the reasonable inferences arising from them (as discussed below) properly permitted the jurors to assess the reasonableness of the defendants' actions.[1] It is my position in dissent that, when viewed in the light most favorable to the defendants, reasonable inferences drawn from the record support the jury's determination. Admittedly, this is a difficult and close case. Nevertheless, given the situation faced by the officers, I believe that whether four shots was too many under the circumstances was a question properly presented to the jurors.

"The dispositive question is whether, in light of the facts and circumstances that confronted the officer[s] (and not 20/20 hindsight), the officer[s] behaved in an objectively reasonable manner." *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) (quoting *McAllister*, 615 F.3d at 881). As the majority observes, relevant factors to consider include the severity of the crime, the immediate threat the suspect poses to the safety of the officers or others, and whether the suspect is actively resisting

---

[1] When the defendants moved for summary judgment on Phillips's excessive force claim, Phillips didn't file a cross-motion for summary judgment, but instead, responded that there were genuine issues of fact for the jury. (Doc. 51, p. 33) ("[T]here are two distinct versions of the facts here, including several material issues for the jury which will bear directly on the 'reasonableness inquiry.'"). In fact, Phillips waited until two separate juries failed to find in her favor before claiming that she should win as a matter of law. (The first jury to try the case was unable to reach a verdict.)

arrest or attempting to evade arrest by flight. *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

The jury was presented with sufficient facts to support a finding that the officers behaved in an objectively reasonable manner. The crimes under investigation were not trivial. Lieutenant Russell Jack and Officer James Hoffman reasonably believed that the woman in control of the vehicle (who they discovered after the arrest was Tamara Phillips) might act dangerously and unpredictably based on the dispatch reports and their observations of her bizarre behavior inside the vehicle. Indeed, Phillips's erratic driving (one caller described the vehicle as "all over the road") endangered other drivers and ended with the vehicle stopped on a sidewalk and facing the street in a residential area. When officers repeatedly ordered Phillips to show her hands and exit the vehicle, instead of complying, she lit a cigarette, placed a water bottle outside the driver's door, and at one point placed both feet out of the driver-side window, leaning back toward the center console. The events of that evening were full of uncertainty. The lighting of the cigarette is just one example of the ambiguity confronting the officers. Was this the action of a highly intoxicated individual or "one last smoke" by a person intending to undertake a violent confrontation with the police? We know now that it was, fortunately, the former and not the latter, but

how could the police on the scene know that at the time of the incident?

There was also confusion over whether the vehicle was stolen. Even though the officers had information suggesting the vehicle may not have been stolen, the facts were sufficient for the jury to find that the officers acted reasonably in approaching the situation as a "high risk traffic stop" involving a potentially stolen vehicle. I agree with the majority that there was "sufficient information to call into question whether Phillips's vehicle was stolen," Maj. Op., p. 18, but the officers on the scene did not have the luxury of investigating why the license plate number of a car reported stolen was transferred to a different vehicle. Lieutenant Jack testified that the Department of Transportation had a general policy prohibiting reassignment of plates from stolen cars to other vehicles. Under these circumstances, the jurors could find it reasonable for the officers, out of caution, to proceed as though the vehicle was stolen.

The officers had reason to believe that Phillips posed a threat to the safety of the officers and others. The car was in a residential area where people could be traveling and was pointed toward the street in the direction of the officers. The officers testified that they believed the car was still running because its headlights were on. Based on these facts, a reasonable jury could find that the officers faced a threat that Phillips would attempt to drive the car toward them, especially considering her subsequently confirmed intoxicated state and bizarre behavior.

The majority concludes that there was no immediate threat because "[t]he officers had [Phillips's] vehicle surrounded with seven squad cars, and behind the vehicle there was a steep drop-off." Maj. Op., p. 22. I have a slight disagreement with this understanding of the scene; I don't think the most favorable construction of the record shows that all seven squad cars were surrounding Phillips's vehicle; some were blocking traffic on adjacent streets. (Tr. p. 88). But that is not a major point, and I agree it was not likely that Phillips could have escaped because it would have been extremely difficult for her to plow through the phalanx of policemen and police vehicles, to say nothing about her chances of eluding them in a chase. But that doesn't mean she wasn't in a position to harm the officers by driving her car forward. Although Phillips's feet were outside the car, within seconds she could have hit the gas. Again, the officers could have reasonably believed that Phillips was substantially under the influence of alcohol or drugs, and as a result, mentally unstable and unpredictable. The officers also did not know whether Phillips was armed, making her strange and unpredictable behavior even more alarming. These circumstances, combined with the confusion over the stolen vehicle report with respect to the license plates on the vehicle, required the officers to proceed with extreme caution. As such, they could reasonably believe that Phillips posed a threat to their safety and to anyone else who might be in the vicinity.

Because this was a high-risk traffic stop, police procedure was to order the "suspect to shut the car off, put

the keys outside the car, and then step out of the car, and then walk back to [a] safe location" for the officers to take the suspect into custody. (Tr. p. 193). Despite the officers' clear, loud, and repeated orders to step out of the vehicle, Phillips failed to comply. Her unresponsiveness to Lieutenant Jack's commands to step out of the car "did not neutralize the safety threat, but rather exacerbated it by adding an element of unpredictability." *See Smith v. Ball State Univ.*, 295 F.3d 763, 769 (7th Cir. 2002) ("Smith posed a threat to himself, the officers and the general public, even after Officer Foster turned off Smith's vehicle and attempted unsuccessfully to communicate with him. Indeed, . . . his unresponsiveness did not neutralize the safety threat, but rather exacerbated it by adding an element of unpredictability."). Phillips continued moving around in the vehicle and had even reached toward the glove box, which Officer Hoffman testified would be consistent with "someone . . . obtaining a weapon." (Tr. p. 196). Although Lieutenant Jack radioed dispatch and said, "We have the person secured here, not in handcuffs, but stabilized in the car," he testified that meant the suspect was in the car, the car wasn't moving, and the driver was not currently fleeing. (Tr. p. 286). Lieutenant Jack never indicated that the driver no longer posed a threat to their safety.

I agree that Phillips wasn't actively resisting arrest in the sense of physical resistance; she wasn't aggressive or confrontational at any point. She nevertheless failed to obey the officers' repeated, simple commands to step out of the vehicle. Based on the evidence presented to

the jurors, they could have reasonably found that Phillips's noncompliance was purposeful, conscious resistance to submission of their authority. The officers had reason to believe Phillips was conscious (based on her lighting of the cigarette and other movements) and there was nothing indicating that she was suffering from a medically induced condition aside from intoxication. *Compare Padula*, 656 F.3d at 602 (force used against driver suffering from a hypoglycemic episode was not excessive where there was no facts alerting the officers of his medical state), with *McAllister*, 615 F.3d at 884 ("[T]he evidence shows that Price ignored obvious signs of McAllister's medical condition, pulled him out of the car, and took him to the ground with such force that McAllister's hip was broken and his lung bruised from the force of Price's knee in his back . . . ."). The officers wanted Phillips to step out of the car because they were uncertain what Phillips might do if they ap-proached, whether she had any weapons within reach, or whether there was anyone else in the vehicle. The goal in a high-risk stop is to distance the suspect from the vehicle as much as possible so that officers can control the environment in which the person is taken into custody. (Tr. p. 215). Under these facts, and looking at the situation as it was unfolding at the time, a jury could have determined that it was reasonable for the officers to use the SL6 baton launcher to gain com-pliance with their orders.

Of course, this case certainly gets more difficult when determining the reasonableness of multiple shots. The officers couldn't simply keep shooting the baton

launcher until they gained compliance; at some point the amount of force becomes excessive. As the majority properly suggests, repeated applications of force are "reasonable only when exercised in proportion to the threat posed," and "'striking a resisting suspect once is not the same as striking him ten times.'" Maj. Op., p. 30 (quoting *Cyrus*, 624 F.3d at 863). "It's the totality of the circumstances, not the first forcible act, that determines objective reasonableness." *Cyrus*, 624 F.3d at 863. Under the totality of circumstances, however, whether four shots was too many was a question properly presented to the jury. The standard for judgment as matter of law is stringent. *See Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). We review "the record as a whole to determine whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (quotations omitted). We must construe the facts strictly in favor of the party who prevailed at trial, *Schandelmeier-Bartels*, 634 F.3d at 376, and "will overturn the jury's verdict only if no reasonable juror could have found in the defendants' favor," *Clarett*, 657 F.3d at 674.

After hearing testimony from Phillips, Officer Hoffman, and Lieutenant Jack and weighing the evidence, a properly instructed jury found that Phillips failed to prove that the defendants' use of force was excessive from the perspective of a reasonable officer facing the same circumstances that the defendants faced on the

night of November 11. The jury was instructed to consider "the need for the use of force; the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any efforts made by the defendant to temper or limit the amount of force; the severity of the crime at issue; the threat reasonably perceived by the officers; whether the plaintiff was actively resisting arrest or was attempting to evade arrest by fleeing." (Doc. 145, pp. 10-11). Respectfully, I disagree with my majority colleagues and believe that if all the evidence and all reasonable inferences are construed in favor of the defendants, as we must, a reasonable jury could find that the officers' repeated use of force was not excessive.

This is not a case like *Cyrus* where the officers' use of repeated force resulted in the death of an individual who was passively resisting arrest and posed no continuing threat to the officers' safety. *See Cyrus*, 624 F.3d at 858 (question of fact existed where unarmed arrestee died after repeatedly being tasered while laying face down on the pavement); *see also Griffith v. Coburn*, 473 F.3d 650, 643, 658 (6th Cir. 2007) (question of fact existed where officers' use of neck restraint resulted in death of unarmed arrestee who was only passively resisting by trying to put his arm behind his back and refusing to help or cooperate in any way with officers' commands).

In this case, the officers used intermediate force that resulted in no severe permanent injuries; Phillips was left with scarring from the incident but she doesn't

walk with a limp or have any existing pain. (Tr. p. 66). The SL6 is a less-lethal force to be targeted at an area below the groin and is designed to impede suspects, not to cause great bodily harm. (Tr. pp. 97, 300). Officer Hoffman testified that he was trained to use the weapon for "resistive, assaultive, or otherwise dangerous behavior," (Tr. p. 128), and they decided to use this weapon particularly so they could maintain a safe distance from the vehicle (Tr. pp. 221-23, 227, 300). The SL6 has the equivalent of a .44 magnum pistol black powder primer (Tr. p. 126), but travels at a lower velocity than a bullet fired from a magnum cartridge, and thus, has the level of *force* of a hand baton (Tr. p. 100) or professionally thrown baseball, *see also Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005) ("The Sage Launcher is a 'less lethal' munition that fires a polyurethane baton that is 1.5 inches wide, travels approximately 240 feet per second, and delivers a force of 154 foot/pounds of energy-approximately the energy of a professionally-thrown baseball."). I am not suggesting that the use of force in this case was insignificant, but it certainly resulted in lesser force than that used in *Cyrus* and *Griffith*.

I do not disagree with the majority that the use of an SL6 could be treated "as a species of deadly force," Maj. Op., p. 12 (citing *Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003), but that depends on how the weapon is used, *see Mercado,* 407 F.3d at 1157 (aiming at a person's head constitutes deadly force), and in this case was a question of fact properly reserved for the jury. *See Omdahl v. Lindholm*, 170 F.3d 730, 733 (7th Cir. 1999) (finding that whether bean-bag rounds constitute deadly force was a

factual question for the jury). The officers were trained to use the SL6 in a less-lethal manner so as not to cause serious bodily harm and that's how it was used to gain Phillips's compliance. *See, e.g., Bell*, 321 F.3d at 639 ("Bean-bag rounds are designed to stun and inflict blunt trauma, knocking a person down but not penetrating the skin or damaging internal organs more severely than a kick or punch would."). Phillips undisputedly suffered a painful injury and one shot did penetrate her skin requiring stitches, but after three weeks she was able to walk without a cane and had no permanent physical effects (aside from scarring). I disagree though with the majority's implication that the SL6 necessarily employs a substantially greater degree of force than other weapons categorized as "less lethal," such as tasers. Certainly depending on the manner used, a taser or other restraint techniques could cause more injury than Phillips suffered. *See, e.g., Cyrus*, 624 F.3d at 858 (use of taser); *see also Abdullahi*, 423 F.3d at 768-68 (use of kneeling restraint).

I am not suggesting that force is appropriately used in all situations in which suspects do not comply with police orders or that a passive resister can be ruthlessly beaten into submission. But we have previously found *some* use of force reasonable against suspects who are resisting arrest by failing to comply with police orders. *See, e.g., Padula*, 656 F.3d at 603-04 (given the officers' reasonable belief that driver was intoxicated, they were entitled to forcibly remove suspect from car when he failed to comply with commands to get out); *see also Monday v. Oullette*, 118 F.3d 1099, 1104-05 (6th Cir. 1997) (use of pepper spray reasonable where officer

warned that he would discharge it if individual did not cooperate); *Forrester v. City of San Diego*, 25 F.3d 804, 807-09 (9th Cir. 1994) (finding no Fourth Amendment violation when officers used injury-causing pain compliance techniques on passively resisting demonstrators). Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance. *See Mecham v. Frazier*, 500 F.3d 1200, 1205 (10th Cir. 2007) (officer's use of pepper spray during traffic stop to force motorist from her vehicle was objectively reasonable under the circumstances where she disobeyed officer's orders to exit the car); *see also Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (en banc) (officers can consider passive refusal to comply with officer's requests in using force). The amount of force reasonable is dependent on the totality of circumstances.

Before using force, the officers in this case tried repeatedly for ten minutes to gain Phillips's compliance. Then, at a distance of 40 or 50 feet, Officer Hoffman fired a warning shot, leaving a baseball-sized dent in the driver-side door. The officers continued issuing commands and after five minutes with no response, Officer Hoffman fired the SL6 at Phillips's leg. She yelled out in pain and reached down for her legs, but still didn't comply with the officers' commands. After waiting fifteen seconds, Officer Hoffman fired three more times, again hitting Phillips in the legs. After each shot, Officer Hoffman waited a few seconds for Phillips to comply; she had no further reaction until the fourth shot. After the fourth shot, Phillips finally complied.

While there may not have been an "immediate" or "urgent" need to get Phillips away from the vehicle, the practicalities of the situation required prompt action. This was a Friday night at 7:00 p.m. and the Waukesha police had deployed seven squad cars to the scene. Officers shouldn't be required to take an endless "wait and see" approach under these circumstances, particularly where officers are presented with a potentially dangerous situation and may be called away to respond to other emergencies. "It is easy in retrospect to say that officers should have waited, or should have used some other maneuver—these propositions cannot be falsified—but *Graham* makes it clear that the fourth amendment does not require second-guessing if a reasonable officer making decisions under uncertainty and the press of time would have perceived a need to act." *Bell*, 321 F.3d at 640.

The officers used non-lethal force to obtain Phillips's compliance with their commands after assessing the situation and determining that it was the best option. Similarly in *Clarett*, 657 F.3d at 674-75, we upheld a jury verdict in favor of an officer who used a Taser on the plaintiff three times after she blocked the doorway to her son's bedroom where other officers had already entered. The officer heard a commotion in the bedroom and believed that the officers needed help. *Id.* at 675. He told the plaintiff to move from the doorway and she refused, so he used the Taser to temporarily immobilize and remove her from the doorway. *Id.* The officer "said he considered using other alternatives, such as physically moving [the plaintiff] out of the way, but

because the apartment was small and crowded, a physical confrontation might escalate quickly, risking serious injury. Under the circumstances, [the officer] concluded that using the Taser was his best option." *Id.* The second and third Taser deployments were in response to plaintiffs' assaultive behavior. *Id.*

After Phillips complied with their commands, no further force was necessary and no further force was used. I also do not suggest that the reasonableness of force is measured by whether it is successful at gaining compliance. As noted above, the officers couldn't simply keep shooting the baton launcher until they gained compliance; at some point the amount of force becomes excessive. But the officers were trained to use the SL6 in an overload fashion, meaning to repeatedly strike the same area. (Tr. p. 100). That's how Officer Hoffman and Lieutenant Jack used the weapon against Phillips so they could safely take her into custody. It was not unreasonable for the officers to use the SL6 in this fashion, and "[i]n light of our hesitation to second-guess the snap judgments made by law enforcement personnel," *see Padula*, 656 F.3d at 604, I would affirm the district court's denial of the plaintiff's motion for judgment as a matter of law, thereby allowing the jury's verdict to stand.

I concede that the majority opinion ably demonstrates that this arrest could have been better handled. And it is extremely unfortunate that Phillips was injured during these events. But, as noted, these facts present a close case and because of that, even if there were some basis

to undo the jury's verdict, for a second reason, I think the judgment of the district court should be affirmed: the officers should be entitled to qualified immunity. "Since the purpose of qualified immunity is to protect public officials from guessing about constitutional developments at their peril, the plaintiffs have the burden of showing that the constitutional right was clearly established." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). To be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *McAllister*, 615 F.3d at 884-85 (quotations omitted).

The SL6 was a relatively new weapon for use in the field by the Waukesha police department; Officer Hoffman had never used it in the field prior to this incident and was not aware that it could penetrate the flesh. (Tr. pp. 128-29). The only case identified by the parties involving the use of an SL6 was *Mercado*, 407 F.3d 1152, decided several months before Phillips's arrest. The officer in that case fired the SL6 at the plaintiff's head from six feet away, but claimed he was aiming for the plaintiff's shoulder *Id.* at 1155. Because the circumstances didn't warrant use of lethal force, the court held that there was a question of fact for trial whether the officer using the SL6 aimed for the plaintiff's head. *Id.* at 1157-58, 1160. In this case, the officers used the SL6

as a non-lethal weapon to gain the suspect's compliance from a safe distance. The weapon was carefully aimed to strike only Phillips's legs. There was no clearly established law alerting the officers that their actions in this instance were unlawful. Nor does the record show that the defendants were aware of similar injuries resulting from uses of the SL6 as it was designed to be utilized.

The majority is correct that by using a new type of weapon officers "do not get a free pass to use it in any manner until a case from the Supreme Court or from this circuit involving that particular weapon is decided." Maj. Op., pp. 28-29. Certainly, qualified immunity doesn't give officers a green light to use new weapons in any unreasonable manner, but it does absolve them of personal liability where they acted cautiously (maybe too cautiously) in a close case requiring judgment calls. *See Mattos*, 661 F.3d at 450 (applying qualified immunity where there was no Supreme Court decision or decision of the court of appeals addressing the use of a taser in dart mode). "[T]he point of qualified immunity and its 'clearly established' requirement is that government officials are not, as a rule, liable for damages in close cases." *Kikumura v. Turner*, 28 F.3d 592, 597 (7th Cir. 1994). "[Q]ualified immunity provides 'ample room for mistaken judgments' and protects government officers except for the 'plainly incompetent and those who knowingly violate the law.'" *Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir. 1999) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

The officers in our case were dealing with a suspected stolen vehicle situation (it was at least reasonable for them to proceed under that assumption) and a driver who had endangered the lives of others before driving off the road in a residential area at night. The vehicle, which the officers had reason to believe was running, was facing them and the driver was, to say the least, unpredictable. Because of the high-risk nature of the stop, the officers determined that it was not safe and against normal procedure to approach the vehicle to physically remove the suspect, particularly given the number of uncertainties with the situation. So they instead decided to use non-lethal force to gain compliance. Significant resources were being utilized to control the situation and it was reasonable for the officers to decide that waiting it out was not a viable option.

Police officers must have the ability to make on-the-scene judgment calls that protect their safety and the safety of the public. That's what the officers attempted to do in this situation and there was no existing legal precedent warning them that their actions were unlawful. This is different from the cases cited by the majority where police used excessive force after the suspect was in their control. Maj. Op. p. 31 (citing *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) (suspect was handcuffed) and *St. John v. Hickey*, 411 F.3d 762, 766 (6th Cir. 2005) (forcing plaintiff who couldn't bend his legs because of muscular dystrophy into back of police car)). Recently, in *Brooks v. City of Aurora*, 653 F.3d 478, 487 (7th Cir. 2011), we held that officers were entitled

to qualified immunity when they used pepper spray against the plaintiff a second time after he stopped resisting arrest. In that case, we noted that the pepper spray was not applied until Brooks had ceased back peddling from the officers and was passively facing them. *Id.* We held that it would not have been obvious to a reasonable police officer that the application of pepper spray was unlawful. *Id.* The suspect had ceased active, physical resistance but had not submitted to authority, had not been taken into custody, and could arguably pose a threat of flight or further resistance. *Id.* Although Phillips had not actively resisted arrest in a physical way, the officers here were similarly presented with a threatening situation because Phillips had not submitted to their authority and had not yet been taken into custody. Accordingly, given the totality of the circumstances as explained above, I believe the officers should at least be entitled to qualified immunity.

For the foregoing reasons, I respectfully dissent and would affirm the judgment in favor of the officers.